**Ex parte Cesar Robert FIERRO a.k.a. Cesar Roberto Reyna.**

No. 71899.

*Court of Criminal Appeals of Texas, En Banc.*

Sept. 11, 1996.

Rehearing Denied Nov. 27, 1996.

David R. Dow, Jean M. Terranova, Houston, for appellant.

John L. Davis, Assistant District Attorney, El Paso, Matthew Paul, State's Attorney, Austin, for the State.

KELLER, Judge.

## OPINION

This is a post-conviction application for writ of habeas corpus filed pursuant to Article 11.07 of the Texas Code of Criminal Procedure. Applicant was convicted of capital murder and sentenced to death. We affirmed his conviction. *Fierro v. State*, 706 S.W.2d 310 (Tex.Crim.App.1986).

In his writ application, applicant contends that the State knowingly presented perjured testimony during a pretrial hearing on applicant's motion to suppress his confession. Applicant claimed during the suppression hearing, and has since maintained, that his confession was coerced by the threat that his mother and stepfather were being held by the Juarez police. The El Paso police officer who took applicant's confession, Al Medrano, testified at the suppression hearing that he had no knowledge that applicant's mother and stepfather were under arrest in Juarez and therefore could not have used that fact to coerce the confession. It was subsequently discovered that a supplemental offense report reflected that applicant's parents were in the custody of the Juarez police. We accordingly abated applicant's writ application and ordered the trial court to conduct a hearing and enter findings of fact and conclusions of law addressing applicant's allegations and any other matters it deemed relevant to disposition of the case. *Ex Parte Fierro*, No. 71,899, slip op. (Tex.Crim.App. Oct. 12, 1994) (unpublished).

After considering live testimony of seventeen witnesses, letter rogatory testimony,[1] and numerous exhibits, affidavits and pleadings, the trial court entered findings of fact as follows:

1) That at the time of eliciting the Defendant's confession, Det. Medrano (now deceased) did have information that the Defendant's mother and step-father had been taken into custody by the Juarez police with the intent of holding them in order to coerce a confession from the Defendant, contrary to said Det. Medrano's testimony at the pretrial suppression hearing.

2) That the District Attorney's Office did not withhold this Supplemental Offense Report from the attorneys for the Defendant.

3) That Det. Medrano presented false testimony regarding the nature and extent of the cooperation between the El Paso police and the Juarez police in this particular case, as it existed in 1979. There was no evidence produced to show that such practices are still taking place.

The trial court made the following conclusions of law:

1) That there is a strong likelihood that the Defendant's confession was coerced by the actions of the Juarez police and by the knowledge and acqiesence [sic] of those actions by Det. Medrano.

2) It is not the conclusion of this Court that the Defendant should be released from these charges, but that he should be retried by another jury who will then render a verdict based on all the evidence, both old and new that has been developed at these hearings.

Applicant urges that we adopt the findings of the trial court and grant him relief based upon his claim that the State used perjured testimony. After reviewing the record, we find that the trial court's factual findings are adequately supported. As a result of the trial court's findings and

---

**1.** A letter rogatory is described as:

A formal communication in writing, sent by a court in which an action is pending to a court or judge of a foreign country, requesting that the testimony of a witness resident within the jurisdiction of the latter court may be there formally taken under its direction and transmitted to the first court for use in the pending action.

Black's Law Dictionary 471 (5th ed. 1983); *see* Fed.R.Civ.P. 28.

the evidence in the record, we conclude that applicant's due process rights were violated by Medrano's perjured testimony.[2] But, because we conclude that the error was harmless, we deny relief.[3]

Traditionally, on habeas corpus review involving federal constitutional error that is subject to a harmless error analysis, we have placed on the defendant the burden of proving, by a preponderance of the evidence, that the error contributed to his conviction or punishment. *Ex Parte Dutchover*, 779 S.W.2d 76, 78 (Tex.Crim.App.1989). *See also Ex Parte Crispen*, 777 S.W.2d 103, 109 n. 6 (Tex.Crim.App.1989) (plurality opinion) (Clinton, J. concurring). *Ex Parte Barber*, 879 S.W.2d 889, 891–892 (plurality opinion) & 893 (Meyers, J. concurring) (Tex.Crim.App.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 739, 130 L.Ed.2d 641 (1995). We apparently made an exception in the case of "knowing use of perjured testimony" by holding that, when such is shown, the Rule 81(b)(2) harmless error standard applies.[4] *Adams*, 768 S.W.2d at 292. *Castellano*, 863 S.W.2d at 485. In applying Rule 81(b)(2), we relied upon *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), which held that error in the admission of perjured testimony was governed by a "materiality" standard identical to the harmless error standard announced in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), upon which Rule 81(b)(2) was based. *Adams*, 768 S.W.2d at

292. But *Napue* and *Bagley* both involved direct rather than collateral attacks. The Supreme Court has now clarified that the *Chapman* standard need not apply to *collateral* review of federal constitutional trial errors. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).[5]

While some constitutional errors are not subject to a harmless error analysis, "they are the exception and not the rule." *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to a harmless error analysis." *Id.* at 579, 106 S.Ct. at 3106–07. An error is subject to a harmless error analysis unless it is "structural." *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991). An error is "structural" only if it is the kind of error that affects the framework in which the trial takes place and defies analysis by harmless error standards. *Id.* at 309–310, 111 S.Ct. at 1264–65. The Supreme Court has recognized the following as examples of structural error: total deprivation of counsel at trial, a biased judge, the unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, and denial of the right to a public trial. *Id.* On the other hand, "trial" error is error which occurs during the presentation of evidence at trial, and may "be quantitatively

2. Due process prohibits prosecutors from presenting testimony that any member of the "prosecution team," including both investigative and prosecutorial personnel, knows to be false. *Ex Parte Adams*, 768 S.W.2d 281, 292 (Tex.Crim. App.1989). *Ex Parte Castellano*, 863 S.W.2d 476, 485 (Tex.Crim.App.1993).

3. Applicant also contends that the State suppressed the supplemental offense report in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Assuming, without deciding, that applicant is correct, we note that the only result of such suppression is that the perjured testimony remained unrevealed. Because prosecutors have a duty to reveal the perjured testimony of members of the "prosecution team," whether or not the prosecutor has knowledge of such perjury, this claim effectively merges into the perjured testimony claim and is prop-

erly analyzed under the standards pertaining to the latter.

4. Tex.R.App.P. 81(b)(2) states:

If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or punishment.

5. In the federal system, a constitutional error is harmful on collateral review only if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. at 1722, 123 L.Ed.2d at 373. The State bears the burden of proving an error to be harmless. *See O'Neal v. McAninch*, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

assessed in the context of other evidence presented in order to determine whether its admission was harmless." *Id.* at 307–308, 111 S.Ct. at 1263–64.[6]

■ The "knowing use of perjured testimony" is clearly error involving the presentation of evidence, and as such, carries all the hallmarks of trial error. The error is quite unlike the examples of structural error listed by the Supreme Court. Those examples defy quantitative comparison because the entire trial process is tainted by the constitutional violation. Not so with perjured testimony: ordinarily, there will also be non-perjured evidence, which would not carry the taint of the constitutional violation. Whether the perjured testimony harmed the defendant can be quantitatively assessed by examining the remaining evidence at trial and the effect of the perjured testimony upon that evidence.

Moreover, the fact that *Bagley* contains a materiality standard is an indication that *Bagley* error is not structural. This conclusion is buttressed by the fact that the Supreme Court has held the materiality standard for the knowing use of perjured testimony to be equivalent to the *Chapman* harmless error standard. *See Bagley*, 473 U.S. at 679 n. 9, 105 S.Ct. at 3382 n. 9. Moreover, the Supreme Court has held that the *Bagley* standard may be legitimately characterized as either a "harmless error" standard or a "materiality" standard: "Although this rule is stated in terms that treat the knowing use of perjured testimo-

ny as error subject to a harmless error review, it may as easily be stated as a materiality standard." *Id.* at 679–680, 105 S.Ct. at 3382. The Supreme Court made clear that, unlike error arising from admission of perjured testimony, error in the suppression of exculpatory evidence would be subject to a less stringent harmless error standard on direct appeal than that ordinarily accorded to federal constitutional trial errors.[7] 473 U.S. at 678–681, 105 S.Ct. at 3381–83. Hence, the Supreme Court appears to have at least implicitly held that the knowing use of perjured testimony is the kind of error that is subject to a harmless error analysis.

Because the materiality standard for perjured testimony is identical to the *Chapman* harmless error standard, a finding of materiality would obviate the need to conduct a harmless error analysis *on direct appeal.* The Supreme Court has not expressly addressed the issue of whether a separate harmless error standard applies on collateral review to the knowing use of perjured testimony. The Court has addressed the applicability of a separate harmless error standard to the suppression of exculpatory evidence. It rejected the standard in that context because the materiality standard for such error is already more lenient (to the State) than the federal habeas harmless error standard. *Kyles v. Whitley*, 514 U.S. ——, —— and —— n. 9, 115 S.Ct. 1555, 1567 and 1567 n. 9, 131 L.Ed.2d 490, 507 and 507 n. 9 (1995).[8] But, because the materiality standard for the

---

**6.** Judge Maloney's dissenting opinion argues that footnote 9 of *Brecht* exempts some "especially egregious" trial errors from a harmless error analysis. But, our reading of the footnote merely indicates that the Court reserved that issue for another day:

> Our holding does not foreclose the *possibility* that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, *might* so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. [Citation to concurring opinion omitted]. We of course are not presented with such a situation here.

507 U.S. at 637 n.9, 113 S.Ct. at 1722 n. 9, 123 L.Ed.2d at 373 n. 9 (emphasis added). Moreover, even if *Brecht* had definitively held that some "especially egregious" errors were immune

to a harmless error analysis, such a conclusion would not mean that the error in this case was such an error. Given the strong presumption that federal constitutional trial errors are subject to harmless error standards, a particular type of trial error should be held subject to a harmless error analysis in the absence of clear direction to the contrary from the Supreme Court.

**7.** The standard is the one applied in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984) which places the burden on the *defendant* to show that "there is a reasonable probability that, [but for the error] ... the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (ellipse and bracketed material added).

**8.** Compare footnotes 5 and 7, *infra.*

knowing use of perjured testimony is the *Chapman* harmless error standard, the materiality standard is more stringent (on the State) than either the state or federal habeas harmless error standards. This leaves open the possibility of applying a separate harmless error standard on collateral review.

In fact, in the wake of *Brecht* (holding *Chapman* to be the inappropriate harmless error standard for federal habeas), two federal circuits have expressly held that the federal habeas harmless error standard applies to error based upon the knowing use of perjured testimony when that error is raised on collateral review. *Gilday v. Callahan,* 59 F.3d 257, 268 (1st Cir.1995), *cert. denied,* —— U.S. —— , 116 S.Ct. 1269, 134 L.Ed.2d 216 (1996). *Robinson v. Arvonio,* 27 F.3d 877, 884–886 (3rd Cir.1994), *vacated for further consideration in light of O'Neal v. McAninch,* —— U.S. ——, 115 S.Ct. 1247, 131 L.Ed.2d 129 (1995).[9] The Third Circuit discussed the distinction between structural error and trial error and held that the knowing use of perjured testimony was trial error. *Robinson,* 27 F.3d at 883–884. The First Circuit noted that the materiality standard for the knowing use of perjured testimony is "friendlier" to the defendant than the habeas harmless error standard, and therefore, both standards had to be satisfied: the materiality standard to establish the due process violation and the habeas standard to establish harm on collateral review. *Gilday,* 59 F.3d at 268. In accordance with the above discussion, we hold that the knowing use of perjured testimony is trial error, subject to the harmless error standard applicable on habeas corpus.

■ Moreover, there is another compelling reason to apply a harmless error analysis to the present case. The perjured testimony here was not used as substantive evidence. Instead, the testimony in question related solely to the admissibility of a confession. The only harm that could possibly flow from the testimony is the admission into evidence of an inadmissible involuntary confession. The Supreme Court has clearly held that the improper admission of an involuntary confession is "trial" error, subject to a harmless error analysis. *Fulminante,* 499 U.S. at 306–312, 111 S.Ct. at 1262–1266. In fact, the Supreme Court characterized it as a "classic 'trial error' " that "is markedly different" from the constitutional violations held to be structural. *Id.* at 309, 111 S.Ct. at 1264. If the admission of an involuntary confession is subject to a harmless error analysis, then how can error based upon the knowing use of perjured testimony, the only consequence of which *may* have been the admission of an involuntary confession, *not* be subject to a harmless error analysis? Obviously, if the improper admission of a confession is subject to harmless error analysis, then the knowing use of perjured testimony to procure the admission of that confession must likewise be subject to harmless error analysis. If the admission of the confession were in fact harmless, it would make no sense to grant relief merely because the admission of that confession was procured through perjured testimony in a pretrial hearing.

■ Because the error in the present case is trial error rather than structural error, application of the habeas harmless error standard is appropriate.[10] Therefore, we

9. The Third Circuit erroneously held that *Brecht* shifted the burden of proof upon the petitioner. *See Robinson,* 27 F.3d at 885. The Supreme Court's action in vacating the decision merely addresses the nature of the habeas standard. It does not undermine the Third Circuit's holding that the habeas standard (whatever it is) applies to the error involving the knowing use of perjured testimony.

10. Judge Clinton's dissenting opinion argues that a separate, habeas harmless error analysis should not apply because applicant "could not have raised" the claim, "even by due diligence, on direct appeal." However, contrary to Judge

Clinton's opinion, the record shows that applicant had the opportunity to discover the basis of his claim in time to advance it at trial or in a motion for new trial. The perjured testimony occurred at a pretrial suppression hearing more than two months before trial. Because Medrano's perjured testimony related to statements he made to applicant, applicant was obviously aware, and in fact contended, at the pretrial hearing, that Medrano's testimony was untrue.

Moreover, the supplemental offense report—which contained in its second paragraph the facts revealing Medrano's perjury—was available at the suppression hearing. Testimony at the

hold that applicant has the burden to prove by a preponderance of the evidence that the error contributed to his conviction or punishment.[11]

■ In addition to the confession, the State also utilized the testimony of Gerardo Olague, an eyewitness to the murder. While applicant's confession alleged that Olague was an accomplice, there is no other evidence in the record to that effect.[12] Thus, had the confession been excluded, there would have been no need to corroborate Olague's testimony. Olague testified in great detail to witnessing applicant commit the murder. In the absence of applicant's confession, there would be no evidence to contradict Olague's statements of how the offense happened. Other than the accomplice allegation, applicant has shown no reason to doubt Olague's testimony.[13]

habeas hearing showed that defense counsel looked at the supplemental offense report during the suppression hearing and cross-examined a witness concerning the report. Evidence at the habeas hearing also supports the State's contention that the report was contained in the State's file before and during trial and that the State's file was open to the defense for examination. The evidence also supports the conclusion that defense counsel did not read the report's second paragraph. The habeas trial court apparently believed this evidence because it found that the State did not withhold the supplemental offense report. Hence, the facts supporting applicant's claim were available in time to raise the issue on direct appeal.

We express no opinion regarding whether an applicant may avail himself of the *Chapman* harmless error standard if he can demonstrate that he had no opportunity to raise the issue on direct appeal. In the present case, applicant has not demonstrated that he lacked such an opportunity.

11. As noted in footnote 5, the federal habeas standard differs from our formulation of the state standard. But, because we are not bound to apply federal harm standards to our post-conviction writs, we apply the state standard announced in *Dutchover*.

Judge Clinton accuses us of impliedly adopting the *Brecht/O'Neal* federal habeas standard and then "distorting" it. He claims that we distort that standard by using the word "contribution" and by adopting the preponderance level of confidence. But in his own concurring opinion in *Crispen*, Judge Clinton stated:

In a collateral attack, however, where the burden is upon the applicant to establish the illegality of his constraint, we might justifiably require an applicant to plead and prove that asserted constitutional error in fact *more likely than not contributed* to his conviction.

777 S.W.2d at 109 n. 6. (Emphasis added.) It is clear that we adopted this very portion of his opinion as the law of Texas in *Dutchover*. 779 S.W.2d at 78.

In his dissent, Judge Baird claims that the *Chapman* standard should be used on habeas because *Adams* and *Castellano*, two habeas cases, used that standard. He argues that our opinion suggests that the *Adams* and *Castellano* Courts were unaware that the proceedings involved collateral attacks. This opinion makes no such suggestion. We do submit that the Courts in those cases were unaware of the *significance* of such proceedings on a harmless error analysis. *Dutchover*, which formulated the general harmless error test for state habeas, was decided eight months after *Adams*. Although decided later, *Castellano* does not make a single reference to *Dutchover*, or even to *Brecht*. The only habeas case that *Castellano* cites in support of a *Chapman* harmless error analysis is *Adams*. Neither *Adams* nor *Castellano* discussed the potential significance of a case's posture as a collateral attack on the materiality/harm determination. Moreover, the federal decisions applying a separate habeas harm standard to perjured testimony were decided after both *Adams* and *Castellano*.

Judge Baird further claims that we "do not explain why or how" application of the *Chapman* standard is erroneous in the present context. He has apparently missed the point of our entire opinion. Our thesis is simple: the knowing use of perjured testimony is the type of error that is subject to a habeas harm standard, and the appropriate standard of harm on habeas review is the one announced in *Dutchover* rather than the *Chapman* standard. We think the supporting reasoning for this thesis is made clear enough in our opinion.

12. When questioned about the contents of Olague's written statement, Detective Medrano testified that Olague said that "they both dragged the body." An examination of Olague's statement shows that Medrano's testimony in this respect was inaccurate. Given the nature of this testimony, we believe it does not raise the issue of accomplice status.

13. For the most part, we disagree with Judge Maloney's characterization of the evidence regarding Olague's credibility. For example, Judge Maloney claims there was some indication that a deal had been reached between Olague's attorney and the prosecution. But, although defense counsel asked Olague whether he knew of such a deal, Olague said he did not, and the defense never elicited any evidence that there was a deal. More important, Olague was not even appointed an attorney until *after* he had told the police what occurred during the offense. Judge Maloney is also skeptical about Olague's delay in going to the police. But, the mere fact

■ The difference between the *Chapman* and the habeas harmless error standards is the difference between a possibility and a probability. *See Gilday,* 59 F.3d at 269. We agree that the applicant has met the *Chapman* standard. The error likely caused the admission into evidence of an involuntary confession, thus raising the possibility that the error contributed to the verdict. But, given Olague's eye-witness testimony and the lack of any real reason to doubt his credibility, it is more probable than not that the outcome of applicant's trial would have been the same absent the confession.[14] Under these circumstances, the ap-

---

that he came forward, when the police were not even aware of his existence, weighs in Olague's favor. Moreover, Olague's written statement explains that he was afraid applicant would kill him. In the end, he revealed what had happened even though he believed "it could mean [his] life if Cesar Fierro found out." And finally, Judge Maloney finds a discrepancy in Olague's testimony about how long he had known applicant. Although there is testimony that could be described as ambiguous regarding when Olague met applicant, in our view, Olague's testimony is consistent in that regard—testimony about dealing with applicant for several months refers to the months before Olague went to the police, not the months before the murder. When Olague's testimony is read in its entirety, and viewed in light of the rest of the evidence, his credibility is solid.

14. Judge Clinton argues that we erroneously impose an outcome-determinative test for harm. He supports his argument by claiming that neither the *Chapman* nor the *Brecht* tests are outcome-determinative, and he claims that the Supreme Court manifested its intent with regard to those tests by clearly formulating an outcome-determinative test in *Strickland.* Of course, *Dutchover* employs neither the *Chapman* nor the *Brecht* tests for harm. Even assuming some relationship to those federal harmless error tests (the word "contribution" is, after all, derived from *Chapman* ), we reject Judge Clinton's premise.

Judge Clinton apparently views the harmless error standards as containing three components: (1) burden of proof, (2) nature of the harm, and (3) level of confidence that the harm will occur. In our view, Judge Clinton's supposed prongs two and three are actually a single inquiry: the level of confidence to which a reviewing court believes the error affected the outcome. An evaluation of Supreme Court pronouncements concerning the *Chapman* and *Brecht* standards supports this conclusion. Several times, the Supreme Court has expressly referred to the *Chapman* standard as determining the effect of an error on the "outcome" of the case. *Satterwhite v. Texas,* 486 U.S. 249, 256, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988). *Berkemer v. McCarty,* 468 U.S. 420, 444–445, 104 S.Ct. 3138, 3152–53, 82 L.Ed.2d 317 (1984). This issue was addressed in detail in *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986):

Harmless error analysis addresses a different question: what is to be done about a trial error that, in theory, may have altered the basis on which the jury decided the case, but in practice clearly had no effect on the outcome? This question applies not merely to Sandstrom violations, but to other errors that may have affected either the instructions the jury heard or the record it considered—including errors such as mistaken admission of evidence, or unconstitutional comment on a defendant's silence, or erroneous limitation of a defendant's cross-examination of a prosecution witness. All of these errors alter the terms under which the jury considered the defendant's guilt or innocence, and therefore all theoretically impair the defendant's interest in having a jury decide his case. The dissent's argument—that the Sixth Amendment forbids a reviewing court to decide the impact of a trial error on the outcome [citation omitted] logically implies that all such errors are immune from harmless-error analysis. Yet this Court repeatedly has held to the contrary.

*Id.* at 582 n. 11, 106 S.Ct. at 3108 n. 11. The Supreme Court has further referenced the *Chapman* standard as determining whether error is "harmless beyond a reasonable doubt." *Kyles,* —— U.S. at ——, 115 S.Ct. at 1567, 131 L.Ed.2d at 507. Use of the general word "harmless" in connection with a level of confidence indicates that the nature of the harm is the same for various harmless error standards—whether the error affected the outcome—and the difference between the standards centers on the burden of proof and the level of confidence.

Likewise, cases involving the *Brecht* standard show that it is also outcome-determinative. *Brecht* adopted, for collateral review, the harmless error standard announced in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *Brecht,* 507 U.S. at 621, 113 S.Ct. at 1713, 123 L.Ed.2d at 363. *Kotteakos* recognized that harmlessness is determined by taking into account the error's likely effect on the outcome of the trial. *Id.* at 764, 66 S.Ct. at 1247. In *United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), the Supreme Court held that an error was harmless under *Kotteakos* because of the "overwhelming evidence of guilt." *Lane,* 474 U.S. at 450, 106 S.Ct. at 732. The Court explained that the *Kotteakos* standard was not a sufficiency of the evidence inquiry but differed in the level of confidence needed to establish harm:

[T]he harmless error inquiry is entirely distinct from a sufficiency-of-the-evidence inquiry.... But that does not mean that overwhelming evidence of guilt is irrelevant; the threshold of overwhelming evidence is far higher than mere sufficiency to uphold conviction.

plicant has failed to carry his burden of proving harm by a preponderance of the evidence.[15]

Accordingly, the application for writ of habeas corpus is DENIED.

*Lane,* 474 U.S. at 450 n. 13, 106 S.Ct. at 732 n. 13. Recently, the Court reiterated that, under *Kotteakos,* "the error must have been prejudicial: It must have affected the outcome" of the proceedings. *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508, 519 (1993).

We agree with Judge Clinton that "the difference in language" between the various harmless error standards "stands for something." The difference in language signifies different degrees of confidence. The phrase "substantially and injuriously affect and influence the jury's verdict" in *Brecht* simply reflects a greater degree of confidence in the effect on the outcome than the phrase "beyond a reasonable doubt did not contribute to conviction or punishment" found in *Chapman.*

15. All four dissenting opinions argue that the prosecutor's affidavit demonstrates harm by alleging that he would have dismissed the case unless he could have corroborated Olague's testimony. While the prosecutor's view of the evidence at trial is itself some evidence to consider in determining whether applicant has met his burden of proof on habeas corpus, it is not controlling. For the reasons stated in the body of this opinion, we believe that the evidence at trial reveals that Olague's testimony was credible and did not need to be corroborated. Moreover, much of the physical evidence was consistent with Olague's testimony and his statements to the police—corroborating Olague's story. While such evidence may not be the kind of corroboration envisioned by the accomplice witness rule, as we have already noted, without the confession, there was no evidence that Olague was an accomplice. Ironically, this fact was made very clear by the prosecutor in his closing argument to the jury. Further, the source of mistrust for accomplice testimony is the possibility that the accomplice is attempting to shift blame for a crime in which he was involved. But, the defense never made such a claim. Instead, the defense theory in closing argument centered on whether Olague was present when the murder occurred. The defense argued that Olague was not present but made up the entire story. The consistency between Olague's testimony, his statements to the police, and the physical evidence was more than enough corroboration to establish Olague's credibility on that matter.

Judge Clinton's contention that we must look at the trial that occurred (i.e. there was evidence of accomplice status because the confession was admitted) appears to be an attempt to have one's

CLINTON, Judge, dissenting.

Both the majority opinion and Judge Maloney in dissent agree that applicant in this cause has established that he has suffered a deprivation of due process. Thus the entire Court concludes that the State knowingly used false testimony in this cause. As I

cake and eat it too. In evaluating harm, Judge Clinton wishes to consider parts of the confession benefitting the State but wants to ignore the parts that benefit appellant. We believe that approach would distort the harmless error inquiry.

In analyzing harm, Judge Baird focuses on the motion to suppress and appeal stages of the case but neglects the trial stage. Obviously, an error occurring within a motion to suppress proceeding must have an adverse effect on the outcome of that proceeding in order for harm to exist. But, an exclusive focus on the motion to suppress proceeding does not go far enough. If the erroneous admission of the contested evidence (i.e. the confession) did not affect the outcome of the trial, then the error is harmless, despite the fact that it affected the outcome of the suppression proceeding, resulting in the admission of the evidence at trial. As for appeal, the error in the present case occurred during trial, not in connection with appeal. Judge Baird's attempt to focus on the outcome of an appeal would collapse all habeas cases to direct appeal standards because the outcome of an appeal would necessarily turn on the application of a direct appeal standard of harm. Having decided that a different standard of harm applies to habeas corpus, we reject an indirect attempt to collapse those standards.

Finally, Judge Baird criticizes our opinion for converting the materiality requirement into a pure harm analysis. But, even the other dissenting opinions recognize the overlap between materiality and harm concepts, and Supreme Court caselaw supports treating the concepts the same. Nevertheless, there is an analytical difference that our opinion continues to respect: materiality is a component of the due process violation, and hence a component of the error, while harm is a separate inquiry. Viewed from that perspective, the *materiality* standard for perjured testimony remains what it has always been—the *Chapman* test. But the *harm* standard on collateral review is the *Dutchover* test. When the materiality standard is the same as or more lenient (to the State) than the harm standard, then a harm analysis is of course redundant. Establishing the error would automatically establish harm, and so it is on direct appeal. But, in the case of perjured testimony, the materiality standard is less lenient (to the State) than the habeas harm standard. Thus, establishing error does not automatically establish harm on habeas corpus, and harm must be shown in accordance with *Dutchover.*

understand it, the majority further concludes that applicant has established the materiality of the false testimony; that is to say, the record admits of a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Bagley*, 473 U.S. 667, 678–79, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481, 492 (1985), quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349–50 (1976). Nevertheless, in the majority's scheme of things, applicant still cannot prevail. The reason is that applicant has failed to meet the standard of harmfulness announced by the United States Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). But we have never adopted such a standard for harm in post-conviction habeas corpus in Texas,[1] and, indeed, the majority only implicitly adopts it today. At least in the context of the particular error presented here, I believe it is a mistake to apply the *Brecht* test. But even if I believed that we should adopt that harm test in Texas, I could not agree with the majority today that applicant has failed to satisfy it.

### I.

I should preface my remarks with a statement about post-conviction habeas cognizability. I presume the majority considers applicant's claim cognizable simply by virtue of the fact that it is brought under the auspices of due process. And it is indeed the law in Texas that practically any federal constitutional claim is cognizable in an Article 11.07 application for post-conviction writ of habeas corpus. *Ex parte Banks*, 769 S.W.2d 539, 540 (Tex.Cr.App.1989). I would not have it that way. Over the last half dozen years I have advocated *reducing* habeas cognizability of federal constitutional claims to those so "exceptional,"

> "so fundamental to the fair operation of the system as to be 1) immune from procedural default, 2) not subject to a harm analysis, and 3) fully retroactive in application. [*Ex parte Goodman*, 816 S.W.2d 383, 388 (Tex.Cr.App.1991) (Clinton, J., concur-

ring)] I would also adopt a doctrine of excuses, entertaining any federal constitutional claim recognized as of the time of trial but for which a record could not have been made, despite due diligence of the accused, in time to preserve the error for direct appeal. [*Ex parte Dutchover*, 779 S.W.2d 76, 79 (Tex.Cr.App.1989)] (Clinton, J., concurring; *Ex parte Goodman*, supra, at 387–88."

*Ex parte Sadberry*, 864 S.W.2d 541, 545 (Tex. Cr.App.1993) (Clinton, J., dissenting).

The Supreme Court has not clearly indicated whether the knowing use of perjured testimony constitutes a violation of due process absent a showing of "materiality"/harm. See n. 2, *post*. Thus, I am not sure that such a claim would fit my definition of "exceptional" for purposes of my scheme of cognizability of federal constitutional claims. I am confident, however, that applicant's claim would meet my doctrine of excuses, for it appears he was in no position to raise the due process claim here in time to preserve it for appeal. Thus I conclude that it is cognizable not only under the Court's criteria for cognizability in *Ex parte Banks*, supra, but under my own view of habeas cognizability as well.

The majority apparently agrees the claim is cognizable, but turns applicant away for a different reason. The majority concedes that applicant can show "materiality"/harm, at least under the standard for harm ordinarily applicable to federal constitutional errors on direct appeal, *viz: Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). However, because he cannot meet the test for harm in the context of federal habeas review of state convictions, as announced in *Brecht v. Abrahamson*, supra, applicant cannot prevail. It is to this proposition that I turn first.

### II.

In order to establish a violation of due process on direct appeal, an appellant must show that the prosecution knowingly used

---

1. *Judge Meyers has suggested that we adopt the Brecht standard for harm in state post-conviction habeas corpus. Ex parte Barber, 879 S.W.2d* 889, 893 (Tex.Cr.App.1994) (Meyers, J., concurring). So far the Court has not applied itself to the question.

false testimony at his trial. If that is so, and if the testimony was "material," which is to say, "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury[,]" *United States v. Agurs,* supra, then an appellant would be entitled to a new trial. From the caselaw in the Supreme Court it is not entirely certain whether this "materiality" requirement is part of the due process claim itself, or is just another way of saying that knowing use of perjured testimony is subject to the constitutional harmless error analysis of *Chapman v. California,* supra. See *United States v. Bagley,* 473 U.S. at 679–80, 105 S.Ct. at 3382, 87 L.Ed.2d at 492.[2] In any event, the Supreme Court has commented that the "reasonable likelihood that the false testimony could have affected the judgment of the jury" test is functionally equivalent to the *Chapman* test for harmless error. *Id.,* n. 9. I take this to mean that if from its review of the record the appellate court cannot say that the false testimony did not contribute to the conviction or punishment, it is obliged to reverse the judgment.

That is on direct appeal. What we have before us today is the same kind of claim raised in a post-conviction application for writ of habeas corpus. The same rules do not necessarily apply. For example, we have said that in the context of state post-conviction habeas corpus, for any federal constitutional claim that is subject to a *Chapman* harm analysis, the applicant has the burden to establish harm, just as he has the burden to establish every other fact which if true would entitle him to relief. See *Ex parte Dutchover,* supra at 77–78; *Ex parte Barber,* supra at 891–92.[3] Thus we place the burden of proof as to harm on the applicant. The federal courts reviewing state convictions in federal applications for habeas corpus place the burden as to harm differently. In *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Supreme Court declared that when a federal habeas court has a grave doubt whether constitutional error in a state prosecution was harmful, it should err on the side of the applicant and grant habeas relief. Although the Supreme Court expressly eschewed the terminology of burden-of-proof, the rule of default that it announced in *McAninch* nevertheless operates in essentially the same way that a burden of proof does: it tells the court which party wins should it find itself in doubt as to the outcome. Thus, in *McAninch* the Supreme Court effectively placed the burden on the State to prove harmlessness in federal habeas corpus.

But while the burden of proof on harm remains the same for federal habeas review of state convictions as it is on direct appeal, the standard for harm does not. As Judge Meyers noted in *Ex parte Barber,* supra at 893, the standard for harm in federal habeas review of federal constitutional errors in state prosecutions has been relaxed. in *Brecht v. Abrahamson.* After *Brecht* it is no longer appropriate for federal courts to grant habeas relief from state convictions simply because they cannot say that federal constitutional error did not contribute to the conviction or punishment, as under the *Chapman* test for harmless error applicable on direct appeal. Instead, a state conviction need only be overturned on federal habeas corpus if the federal court finds (or, after *McAninch,* has a grave doubt whether) the federal constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* supra, 507 U.S. at 637, 113 S.Ct. at 1722, 123 L.Ed.2d at 373.

The majority now incorporates the *Brecht* standard for harm in federal habeas corpus review into our own state post-conviction habeas corpus jurisprudence. The majority does not justify this incorporation, or even acknowledge in a straightforward way that that is what it has done. In my view the

---

**2.** It is for this reason that I find it difficult to say whether the knowing use of perjured testimony would fit my definition of an "exceptional" federal constitutional claim. See text, *ante.*

**3.** Thus, I agree with the majority that in state post-conviction habeas review the applicant has

the burden to show harm, by whatever standard. Op. at 371–372. The question remains what the standard for harm in state habeas should be. The majority implicitly and uncritically accepts the *Brecht* standard.

majority errs in three significant respects. First, the majority errs to adopt the *Brecht* standard at all, at least for measuring harmfulness of the kind of constitutional error involved in this cause. Second, it appears to me that the majority has, in any event, misconstrued the *Brecht* standard. Finally, even if the majority does properly construe *Brecht*, it misapplies its own construction to deny applicant relief in this cause. I next develop these arguments *seriatim*.

### III.

#### A.

There are no compelling reasons for this Court to mimic the *Brecht* standard for harm, at least not for the kind of error we all agree occurred in this cause. The Supreme Court's justifications for adopting a less onerous standard of harmlessness in the federal habeas context are more than passing familiar by now. As the Court observed in *Brecht*:

> "The reason most frequently advanced in our cases for distinguishing between direct and collateral review [of state prosecutions] is the State's interest in the finality of convictions that have survived direct review within the state court system. * * * We have also spoken of comity and federalism."

507 U.S. at 634, 113 S.Ct. at 1720, 123 L.Ed.2d at 371 (citations omitted). But of course, principles of "comity and federalism" cannot by themselves possibly justify this Court preferring the *Brecht* test for harmlessness over that of *Chapman* for purposes of state habeas corpus. This Court has none to defer to but itself. Therefore, if any part of the Supreme Court's rationale could serve to justify our adoption of *Brecht*, it would have to be the State's interest in the finality of a conviction, once it has been affirmed on direct appeal. And indeed, that consideration is weighty enough to convince me that as a general rule this Court should not even recognize as cognizable federal constitutional claims that are not "exceptional." See *Ex parte Dutchover*, supra at 79 (Clinton, J., concurring); *Ex parte Sadberry*, supra at 545 (Clinton, J., dissenting).

But I do not believe the instant claim is cognizable because it is "exceptional" in the sense that I spoke of in *Dutchover* and *Sadberry*. Instead, I believe it is cognizable under the doctrine of excuses; because it is a federal constitutional claim that applicant could not have raised, even by due diligence, on direct appeal. It seems to me that principles of comity and federalism dictate that if a federal constitutional claim cannot, for reasons beyond the applicant's control, be raised any earlier than in a collateral attack in the state forum, the state should address it at that time, not leave it for resolution by a federal habeas court. For the same reasons that I believe such a claim ought to be cognizable on state post-conviction habeas corpus, I also believe that principles of finality should not lead us to apply a less onerous test for harmlessness in the state habeas forum. An applicant who, in spite of all, has been unable to raise a federal constitutional claim on direct appeal, has had no opportunity to reap the benefit of the more favorable standard for constitutional harm in *Chapman*.

If we are willing, as I am, to reach such a claim of federal constitutional error for the first time on collateral attack, we ought also to be willing to afford the applicant the full panoply of constitutional protections. This ought to include the right to a new trial as long as he can show (because the burden is on him in state post-conviction habeas corpus) that the federal constitutional error contributed to his conviction. The State's otherwise compelling interest in finality of convictions should give way in this context to the fact that the applicant has been, through no fault of his own, unable to litigate the claim at any earlier opportunity. As far as I can see, there is no justification for requiring him to satisfy the tougher *Brecht* standard to show that the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637, 113 S.Ct. at 1722, 123 L.Ed.2d at 373. The majority errs to require it anyway.

#### B.

On direct appeal, the burden is on the State to prove constitutional error is harmless. Because in state post-conviction habeas

the burden is on the applicant to show harm, we must articulate the *Chapman* standard for harm in a slightly different way. On direct appeal the State satisfies its burden if it can show beyond a reasonable doubt that the constitutional error did not contribute to conviction. This means, essentially, that if there is any reasonable possibility the error did contribute to the conviction, the judgment must be reversed. See *United States v. Bagley,* supra, 473 U.S. at 679, n. 9, 105 S.Ct. at 3382, n. 9, 87 L.Ed.2d at 492, n. 9. Thus it makes sense to say, applying the *Chapman* standard for harm in state post-conviction habeas corpus, where the burden is on the applicant, that he is entitled to a new trial if the record admits of a reasonable possibility that the constitutional error contributed to his conviction.[4] Even the majority concedes that applicant can satisfy this standard of harm in this cause. Op. at 375–376.

Having uncritically accepted *Brecht* into our habeas jurisprudence, however, the majority denies relief. But when it comes to apply the *Brecht* test in the state post-conviction habeas context, the majority does a strange thing. The majority does not transpose the *Brecht* standard into the key of state post-conviction habeas corpus in the way that one would expect. It seems to me that what the majority should be asking itself, consistent with the standard in *Brecht,* but accounting for the fact that applicant has the burden in state post-conviction habeas, is this: Has applicant shown a reasonable possibility that the constitutional error in this cause "had substantial and injurious effect or influence in determining the jury's verdict"? 507 U.S. at 637, 113 S.Ct. at 1722, 123 L.Ed.2d at 373. One would expect this transposition of the *Brecht* standard because it raises the standard by which an applicant must show harm for state post-conviction habeas purposes in exactly the same proportion that *Brecht* reduces the standard by which the State must show an absence of harm in a federal habeas application.

But the majority asks itself a different question altogether. The majority asks whether applicant can show by a preponderance—that is to say, whether it is more likely than not—that the constitutional error contributed to the verdict. It seems to me that framing the question this way distorts the *Brecht* test in two significant ways. First, and most obviously, the majority does not really utilize the *Brecht* standard ("substantial and injurious effect or influence on the jury's verdict") at all, but reverts to the supposedly-abandoned standard of *Chapman* ("contribute to the conviction"). Because I believe we should be applying the *Chapman* standard in any event, my objection to this first distortion is, of course, purely academic. It is the second distortion that makes all the difference to the majority in this cause.

The second way in which the majority distorts the *Brecht* standard is to require the applicant to prove harm to a level of confidence that *Brecht* itself does not call for, *viz:* a preponderance. Rather than reverse upon a showing that there is a reasonable possibility of harm (by whatever standard, "contribution" or "substantial and injurious effect or influence"), the majority requires the applicant to show that the constitutional error more likely than not harmed him. The majority adopts this preponderance level of confidence because it perceives that the difference between the *Chapman* standard and the *Brecht* standard is "the difference between a possibility and a probability." Op. at 376. This notion the majority borrows from an opinion of the First Circuit Court of Appeals. *Gilday v. Callahan,* 59 F.3d 257, at 269 (C.A.1 1995). For its part, the First Circuit derives the notion from a passage in the Supreme Court's opinion in *O'Neal v. McAninch,* —— U.S. at ——, 115 S.Ct. at 994, 130 L.Ed.2d at 951–52. But the passage in *O'Neal* does not speak to the question by what level of confidence harm must be proved or disproved in order to justify habeas relief. It addresses only the issue of which party bears the loss if the record is insufficient to resolve the question of harm,

4. If after assaying the record the habeas court cannot determine whether there is a reasonable possibility the error contributed to the conviction, the applicant must lose, since he bears the burden of proof. Contrast *O'Neal v. McAninch,* supra (in federal habeas corpus review of state convictions, where habeas court has "grave doubt" whether error harmless, State must lose).

by whatever level of confidence (the Supreme Court simply did not say). Thus, both the First Circuit and the majority today are mistaken. *O'Neal* does not support the proposition that the difference between the standards in *Chapman* and *Brecht* is "the difference between a possibility and a probability." The only real difference between the two is that *Chapman* merely asks whether error "contributed," while under *Brecht* the federal habeas court must be able to say the error "substantially and injuriously affected or influenced the jury's verdict" before it can reverse a state conviction.

The issue in this cause—a post-conviction application for writ of habeas corpus in state court, not federal—ought to be whether the record admits of a reasonable *possibility* the State's knowing use of false testimony contributed to applicant's conviction. We are all in agreement that it does. Therefore applicant is entitled to the relief he seeks.

### C.

Finally, even if I could agree that the question is whether applicant has shown more likely than not that the error contributed to his conviction (or, for that matter, that it more likely than not "substantially and injuriously affected or influenced the jury's verdict"), I would grant him relief. But for the false testimony in this cause, applicant's confession would in all likelihood have been suppressed. Instead it was admitted. I do not understand how the majority could conclude that applicant's confession did not more likely than not "substantially and injuriously affect and influence the jury's verdict" in this cause, much less that it did not more likely than not at least "contribute."

The majority ultimately finds it "more probable than not that the outcome of applicant's trial would have been the same absent [his] confession." Op. at 376. This is an erroneous application of both the *Chapman* and the *Brecht* standard for harm, at least as

I understand them. For neither *Chapman* nor *Brecht* adduced a test for measuring the harm *vel non* of constitutional error that is outcome-determinative. To say that error "contributed to," or even that it "substantially and injuriously affected or influenced" a jury's verdict is not at all the same as saying it was a *sine qua non* of the conviction. Whether or not the outcome of trial would have been the same is not the test under any standard for measuring harmfulness of federal constitutional error that the Supreme Court has announced. When the Supreme Court does want to announce a standard for harm/materiality that is outcome-determinative, it has no trouble making that intention clear. Accordingly, in *Strickland v. Washington,* 466 U.S. 668, at 694, 104 S.Ct. 2052, at 2068, 80 L.Ed.2d 674, at 698 (1984), in defining the prejudice prong of the test for Sixth Amendment ineffective assistance of counsel, and in *United States v. Bagley,* supra, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494, when defining "materiality" of *Brady*-type error (other than the knowing use of perjured testimony), the Supreme Court unmistakably constructed a standard that is outcome-determinative, *viz:* whether there is a "reasonable probability that ... the result of the proceeding would have been different." [5] Neither the *Chapman* nor the *Brecht* standard is phrased this way, and surely the difference in language stands for something.

My conclusion is bolstered by an observation the Supreme Court made in *Kyles v. Whitley,* 514 U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). There the Court was considering, *inter alia,* whether a finding of ordinary *Brady* error in a federal writ, which includes a finding that there is a "reasonable probability that ... the result of the proceeding would have been different," calls for a *Brecht* analysis for harm as a predicate to reversal. The Supreme Court held a *Brecht* analysis unnecessary because "the harm to

---

**5.** It is true that the *Strickland/Bagley* tests are phrased in terms of a "reasonable probability ..." It could not be clearer from context, however, that by "reasonable probability" the Supreme Court did not mean it must be "more likely than not" that the outcome of the proceeding would be different. In *Strickland* the Court expressly eschewed a "preponderance" level of confidence. 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. It is apparent that the Court meant that reversal should follow if there is a reasonable chance the result would be different, not that it is more likely than not a different outcome would result.

the defendant [must be] greater" to justify reversal under the standard for harm/materiality in *Strickland/Bagley* on direct appeal than is required under the *Brecht* standard for reversal on federal habeas corpus. *Kyles,* supra, —— U.S. at ——, 115 S.Ct. at 1567, 131 L.Ed.2d at 507. The Court did not say that the *likelihood* of harm must be greater, but that the harm itself must be. This suggests to me that the difference is not one of levels of confidence; instead it suggests that the harm recognized in *Strickland/Bagley* is of a kind that has a bearing on the outcome of the case, whereas the harm under *Brecht* is qualitatively something less than that. We effectuate this distinction if we construe *Chapman* and *Brecht* to require, not a showing that the error was a *sine qua non* of the jury's verdict, but only that it facilitated that verdict in some substantial way. In other words, the error "contributed," "affected," or "influenced" the verdict, but was not necessary to the verdict.

By this understanding I can only conclude that admission of applicant's confession at his trial not only "contributed to," but indeed, "substantially affected or influenced" the jury's verdict, even to a level of confidence of more likely than not. The Supreme Court has recognized that "an involuntary confession may have a more dramatic effect on the course of a trial than do other trial errors— in particular cases it may be devastating to a defendant[.]" *Arizona v. Fulminante,* 499 U.S. 279, at 312, 111 S.Ct. 1246, at 1266, 113 L.Ed.2d 302, at 333 (1991). It is indeed hard to imagine other evidence so overwhelming that a confession from the defendant's own mouth would not nevertheless "substantially affect or influence" the jury's verdict.

The majority is only able to find harmlessness (even under its distorted *Brecht* standard) by envisioning a hypothetical record in which the applicant's confession was *not* admitted. Without the confession, the majority reasons, the only eyewitness to the offense is not shown to be an accomplice, and the jury would have no reason to doubt his veracity. But this method of harm analysis does not measure the harmfulness of the constitutional error upon the trial that actually occurred. At applicant's real trial, the eyewitness *was*

an accomplice, whose veracity was intrinsically suspect. Under those circumstances it is impossible to believe anything but that applicant's own confession substantially influenced the jury—even if it might have reached the same verdict eventually anyway. The prosecutor must have thought at least as much, for he testified he would not have proceeded with the prosecution had the confession been suppressed unless he could have corroborated the accomplice—even though, according to the majority, such corroboration would have been unnecessary to the sufficiency of the evidence. The majority errs to deny applicant relief in this cause even under its own distorted version of the federal habeas corpus standard for determining harm.

### IV.

We all agree applicant was deprived of due process of law at his first trial for capital murder. Nevertheless the majority denies him another trial because, for reasons beyond his control, he was only able to raise his due process contention for the first time in post-conviction habeas corpus. I would apply the *Chapman* standard for harm and hold that applicant has met his burden to show a reasonable possibility that the error contributed to his conviction. If I believed that *Brecht* announced an appropriate standard for harm in this cause, I would hold applicant satisfied that test as well. Even if I thought the majority was right to apply its bastardized *Brecht* standard, I would hold applicant has met that too. Because it is apparent that under no circumstances will the majority grant relief in this cause, I dissent.

BAIRD, Judge, dissenting.

Everyone agrees that this case presents a due process violation, the knowing use of perjured testimony. Therefore, the ultimate resolution of this case rests on whether the violation was material.

### I.

In the past, we have utilized the harmless error rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and Tex.R.App. P. 81(b)(2) as the standard

for determining materiality. *Ex parte Adams*, 768 S.W.2d 281, 292 (Tex.Cr.App. 1989). The majority correctly notes that the *Chapman*/Rule 81(b)(2) standard was developed in cases on direct appeal. *See, Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *and, United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The majority then notes that the United States Supreme Court has held the *Chapman* standard need not apply to cases on collateral review. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). This also is correct. However, the majority then announces, *in a footnote:* "But, because we are not bound to apply the federal harm standards to our post conviction writs, we apply the stated standard announced in *Dutchover*." *Ante*, at 375, n. 11 (referring to *Ex parte Dutchover*, 779 S.W.2d 76, 78 (Tex.Cr.App.1989).

However, the majority does not explain why or how *our* adoption of the *Chapman*/Rule 81(b)(2) standard was erroneous. Indeed we have applied that standard in two separate habeas cases. *Adams, supra; and, Ex parte Castellano*, 863 S.W.2d 476 (Tex.Cr.App.1993). The majority seems to suggests that somehow the *Adams* and *Castellano* Courts were unaware they were dealing with collateral attacks. For the following reasons, this suggestion is erroneous.

First, the *Adams* Court completely reviewed the history of the case and noted the earlier appeal and affirmance. *Adams* 768 S.W.2d at 283 (citing *Adams v. State*, 577 S.W.2d 717 (Tex.Cr.App.1979). The Court then specifically referred to Tex.Code Crim. Proc.Ann. art. 11.07 and noted that habeas corpus is available only to review jurisdictional defects or the denial of fundamental or constitutional rights. *Id.* at 287 (citing *Ex parte Russell*, 738 S.W.2d 644 (Tex.Cr.App. 1986)). The Court noted that the habeas applicant assumes the burden of proving his factual allegations by a preponderance of the evidence. *Id.* at 287–288. Obviously, the *Adams* Court was very aware that it was dealing with a postconviction collateral attack. Second, as the author of *Castellano*, I can assure the reader that this Court was

well aware that it was dealing with a habeas application. *Id.* 863 S.W.2d at 478–479. Consequently, any suggestion that we were somehow unaware that we were dealing with habeas claims is not supported by either opinion.

Therefore, the *Chapman*/81(b)(2) standard should be applied in the instant case. As the majority notes "applicant has met the *Chapman* standard." *Ante* at 376. Apparently, this is the reason the majority does not apply that standard.

## II.

Even if we expressly rejected the *Chapman*/Rule 81(b)(2) standard for materiality, I would suggest adoption of the standard announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under this standard, the habeas applicant would be entitled to relief if the knowing use of the perjured testimony created a reasonable probability that, had the perjury been disclosed, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. This is the standard the Supreme Court has adopted for *Brady* violations.[1] *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *and, Thomas v. State*, 841 S.W.2d 399, 403–404 (Tex.Cr.App.1992). Applying this standard to the case at bar, two proceedings are especially important.

The motion to suppress the confession hearing is where Medrano perjured himself and the State used the perjured testimony to establish the voluntariness of appellant's confession. This hearing was discussed in our opinion on direct appeal. *Fierro v. State*, 706 S.W.2d 310, 315–316 (Tex.Cr.App.1986). Three points are significant. First, appellant contended his confession was not voluntary because Medrano said appellant's mother was in jail and would remain there until appellant confessed. *Id.* at 316. Second, "Medrano testified he *truthfully* had no information that appellant's mother was in cus-

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

tody." *Id.* at 315.[2] Third, the trial judge entered findings of facts "that Medrano did not tell appellant his mother would remain in jail until he confessed." *Id.* at 316. Our confidence in the motion to suppress proceeding is undermined because the trial judge relied upon the perjured testimony in holding appellant's confession was voluntary.

In the instant case, the habeas judge made the following findings:

> 1) That at the time of eliciting the Defendant's confession, Det. Medrano (now deceased) did have information that the Defendant's mother and step-father had been taken into custody by the Juarez police with the intent of holding them in order to coerce a confession from the Defendant, *contrary to the said Det. Medrano's testimony at the pre-trial suppression hearing.*
>
> \* \* \* \*
>
> 3) That Det. Medrano *presented false testimony* regarding the nature and extent of the cooperation between the El Paso police and the Juarez police in this particular case, as it existed in 1979.

Additionally, the lead prosecutor at the trial, Gary Weiser, has provided this Court with an affidavit where he stated:

> Had I known at the time of Fierro's suppression hearing what I have since learned about the family's arrest, I would have joined in a motion to suppress the confession.

Clearly, the evidence is sufficient to undermine our confidence in the pretrial proceeding which determined appellant's confession was admissible.

For these same reasons, confidence is undermined in another proceeding, appellant's direct appeal. On appeal applicant contended his confession was not voluntary but came about as the result of coercion. *Id.* at 315. We overruled this point of error stating:

> The trial court is the sole trier of the facts at a hearing upon a motion, and this Court is not at liberty to disturb any findings supported by the record.... When

all the circumstances are considered, we conclude they support the trial court's determination that the confession was made voluntarily and that it was admissible in evidence.

*Id.* at 316. Under this deferential standard of review, this Court followed the trial judge's findings of facts, which we now know were made in reliance upon perjured testimony.

A similar incident arose in *Adams,* 768 S.W.2d 281, where the trial judge conducted a hearing to determine whether a witness' identification of the defendant had been tainted. The State violated *Brady* by failing to turn over the witness' contradictory statement at the time of trial and, instead, went to great lengths to conceal it. This Court stated: "Trial courts must be able to rely upon the veracity of its officers. *When deceit produces court rulings that have the effect of denying one a fair trial then the conviction should be vacated." Adams,* 768 S.W.2d at 291.

Because the motion to suppress hearing at the trial court was tainted by the perjured testimony and because the direct appeal was tainted by our reliance upon findings of facts that were derived from that hearing, the evidence is sufficient under the *Strickland /Bagley* standard to establish a reasonable probability that, had the perjury been disclosed, the result of the motion to suppress proceeding and the direct appeal proceeding would have been different.

### III.

The majority converts the requirement of materiality into a pure harm analysis:

> ... But because the materiality standard for the knowing use of perjured testimony is the *Chapman* harmless error standard, the materiality standard is more stringent (on the State) than either the state or federal habeas harmless error standards. This leaves open the possibility of applying a separate harmless error standard on collateral review.

*Ante* at 373. The majority ignores the requirement of materiality and that if material-

---

2. All emphasis is supplied unless otherwise indi-   cated.

ity is established, relief is required. *United States v. Agurs*, 427 U.S. 97, 103–104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). Rather than reaching the materiality issue, the majority conducts a harm analysis and holds applicant has failed to carry his burden of proving harm by a preponderance of the evidence. *Ante* at 377. However, even under this standard, for the reasons stated by Judge Overstreet, *post* at 386, applicant met his burden.

For these reasons, I would find the knowing use of perjured testimony in this case sufficient to warrant setting aside applicant's conviction and returning him to the Sheriff of El Paso County to answer the indictment in this cause.

With these comments, I respectfully dissent.

OVERSTREET, Judge, dissenting.

I agree with the majority that the trial court's findings that the State used perjured testimony regarding the nature and extent of cooperation between the El Paso police and the Juarez police in this case are adequately supported by the record. *Ex parte Fierro*, 934 S.W.2d 370, 371 (Tex.Cr.App.1996). Thus the issue is the materiality/harm, or lack of harm, of the perjury which resulted in the admission into evidence of the coerced involuntary confession. The majority incredibly concludes that the perjury which resulted in the erroneous admission of applicant's detailed, explicit, coerced, involuntary confession was immaterial, i.e. harmless. I can not agree with such an implausible conclusion. I believe that under any standard, the admission of such confession was not immaterial, i.e. it was harmful, i.e. it was not harmless. To make an analysis of the materiality/harm, or according to the majority the lack of harm, of this confession, one must look at and read this confession.

The coerced confession describes in great detail how applicant, in the company of Geraldo Olague, had hailed a taxicab, sat in the back, with Olague sitting in the front passenger's side, and used a chrome-plated .357–magnum to shoot the taxicab driver in the head. It explicitly states that applicant shot the taxicab driver, then got into the driver's side and drove to a small park; whereafter, Olague drug the body out face up and applicant shot him again in the chest. The coerced confession also relates that before they left the body, applicant took a silver watch off the wrist. It describes applicant then driving with Olague and throwing the watch into a trash can in an alley; then driving into Mexico, and leaving the car on the street close to where applicant lived, leaving the car locked with the keys inside. The confession continues by describing applicant, about a week-and-a-half later, traveling with Olague and the gun to Chihuahua City, Mexico, and then boarding a train to Torreon, and selling it to a rancher in Torreon for 2500 pesos; whereafter, applicant and Olague separated in Parral, Chihuahua, with applicant returning to Juarez.

It is totally inconceivable that the jury could have not been convinced of guilt by this detailed, coerced, involuntary, erroneously admitted confession. The majority minimizes its significance by pointing to the testimony of Olague. The majority opines that in light of Olague's eyewitness testimony at trial, which did not inculpate himself, and the lack of any real reason to doubt his credibility, it is more probable than not that the outcome of applicant's trial would have been the same even in the absence of the coerced involuntary erroneously admitted confession. *Ex parte Fierro*, 934 S.W.2d at 375, slip op. at 377. Regardless of whether Olague's testimony had to be corroborated, applicant's involuntary coerced erroneously admitted confession did indeed corroborate it quite well. And it is reasonable to believe that Olague's admitted presence at the scene of the cab ride-turned-capital murder provided a motive to try to deflect the culpability to someone else, namely applicant. Applicant's involuntary coerced erroneously admitted confession certainly does confirm Olague's deflections.

The prosecutor's opening jury arguments at guilt/innocence discussed applicant's confession, and stated that it was made with no pressure or coercion by the detective or anyone else from the El Paso Police Department. The prosecutor also said that in prov-

ing that applicant committed this crime, it relied on two main pieces of evidence: "the Defendant's confession, and the sworn testimony of the eye-witness to this case, Jerry Olague." He also argued about Texas law allowing for the admission of a confession "if it appears that [it] is freely made, without compulsion or persuasion, and wholy [sic] voluntary," and that the State had put on testimony from the detective and the stenographer who had taken the confession. The prosecutor insisted that there was no coercion and that "beyond all doubt whatsoever" the confession was voluntary. He added that the only way that the jury could find applicant "not guilty" would be to disbelieve everything that Olague had said and to throw out the confession; but that the jury could not in good conscious let "a confessed murderer—someone who confessed to a cold-blooded murder as this is," go free.

During closing jury argument at guilt/innocence, the other prosecutor also discussed the confession. He thought that the jury had "to consider the confession first, and then consider whether or not Mr. Olague is an accomplice." He also read from the confession, and pointed out that if the jury wanted these exhibits it had to ask for them—he told them that after electing a foreman, "[P]lease ask for the exhibits. I think it's important that you are able to read this. Get the [E]nglish and [S]panish version." However, he also pointed out that if the jury disregarded the confession, there was still Olague's eyewitness testimony and nothing to indicate that he was an accomplice, thus no need for corroboration. The prosecutor then suggested that if the jury did not believe Olague's testimony, it was still left with applicant's confession—"Well, if you don't believe Olague, you've got to convict the Defendant on his own testimony." He then discussed indicia of voluntariness, including the stenographer's testimony and the confession's indication that Olague dragged the body. He pointed out that applicant was "admitting to capital murder; ... admitting to blowing the man's brain's out; ... admitting to stealing the watch, but not to dragging the body." Thus applicant's involuntary coerced inadmissible confession was a signifi-

cant topic of discussion by the prosecution at guilt/innocence jury arguments.

Also, the jury heard and saw the evidence in this case, including applicant's involuntary coerced erroneously admitted confession. The record reflects that the jury even specifically requested that applicant's confession be provided during deliberations. Copies of the confession (in English and Spanish) were so provided. The jury also requested a copy of Olague's written statement; but because such was not introduced into evidence, it was not provided to the jury. The record reflects that on February 14, 1980 the jury requested the confession and statement at 1:16 p.m., was provided applicant's confession at 1:19 p.m., re-requested Olague's statement at 1:58 p.m., was informed that it could not receive such at 2:33 p.m., and advised via a note that it had reached a verdict at 2:53.

Interestingly, the lead prosecutor, who was the First Felony Assistant District Attorney, indicated via affidavit that had he known about the cooperation between the El Paso police and the Juarez police he would have joined in a motion to suppress the confession, and that his experience as a prosecutor indicated that the trial judge would have granted the motion as a matter of course. His affidavit also stated that "[h]ad the confession been suppressed, [he] would have moved to dismiss the case unless [he] could have corroborated Olague's testimony." That prosecutor also testified at the hearing on this habeas corpus application and seemed disconcerted about his closing jury arguments from the trial about the voluntariness of the confession and the El Paso detective not knowing about the Juarez police having applicant's family in custody—knowing what he now knew, he said that he would not have made some of those jury arguments. Thus the lead prosecutor who tried the case obviously does not think that applicant's involuntary coerced erroneously admitted confession was not "material" in securing the conviction and death sentence.

Any standard of harm, even the majority's own standard, i.e. that applicant has the burden of proving by a preponderance of the evidence that the error contributed to his conviction or punishment, is surely met; cer-

tainly applicant's detailed, explicit, involuntary, coerced confession itself proves by a preponderance of the evidence that it contributed to his conviction—what better evidence of guilt than the words of the defendant himself (though unbeknownst to the jury such words were coerced by the unrevealed "cooperation" between the El Paso police and the Juarez police) admitting such a robbery-shooting-killing?

One can have eyewitness testimonial evidence, circumstantial evidence, scientific evidence, and even videotaped evidence; but a confession explicitly admitting guilt signed by the defendant is the most powerful piece of evidence that can ever be introduced against him and will surely serve as the key that will lock the jail-house door and provide the juice to power the electric chair; and in these more civilized times, the juice for the needle.

Because the majority finds that the perjurious testimony which paved the way for the erroneous admission of applicant's involuntary coerced confession was immaterial, i.e. not harmful, I strongly dissent with principle.

MALONEY, Judge, dissenting.

This is a post-conviction application for a writ of habeas corpus filed pursuant to Tex. Code Crim.Proc.Ann. art. 11.07. Applicant was convicted of capital murder and sentenced to death. We affirmed his conviction on direct appeal to this Court. *Fierro v. State*, 706 S.W.2d 310 (Tex.Crim.App.1986).

Applicant contends the State knowingly presented perjured testimony during a pretrial hearing on his motion to suppress his confession. We abated applicant's writ application and ordered the trial court to conduct a hearing and enter findings of fact and conclusions of law addressing applicant's allegations.[1] *Ex parte Fierro*, No. 71,899 slip op. (Tex.Crim.App. Oct. 12, 1994) (unpublished).

The trial court entered findings of fact as follows:

1) That at the time of eliciting the Defendant's confession, Det. Medrano (now deceased) did have information that the Defendant's mother and step-father had been taken into custody by the Juarez police with the intent of holding them in order to coerce a confession from the Defendant, contrary to the said Det. Medrano's testimony at the pre-trial suppression hearing.

2) That the District Attorney's Office did not withhold this Supplemental Offense Report from the attorneys for the Defendant.

3) That Det. Medrano presented false testimony regarding the nature and extent of the cooperation between the El Paso police and the Juarez police in this particular case, as it existed in 1979. There was no evidence produced to show that such practices are still taking place.

The trial court concluded, as a matter of law:

1) That there is a strong likelihood that the Defendant's confession was coerced by the actions of the Juarez police and by the knowledge and acqiesence [sic] of those actions by Det. Medrano.

2) It is not the conclusion of this Court that the Defendant should be released from these charges, but that he should be retried by another jury who will then render a verdict based on all the evidence, both old and new, that has been developed at these hearings.

The majority finds the trial court's factual findings are supported by the record, but denies relief, concluding the error in admitting the perjured testimony was harmless. *Majority* op. at 371. Specifically, the majority holds that applicant has not demonstrated, by a preponderance of the evidence, that the use of perjured testimony was harmful. *Ma-*

---

1. The case was filed and set on the following two allegations:

(1) The State knowingly presented perjured testimony regarding a crucial point, Medrano's knowledge of the family's arrest, and withheld this information from the defense, in violation of the Fourteenth Amendment to the United States Constitution.

(2) The State knowingly presented perjured testimony regarding the nature and extent of the cooperation between the El Paso police and the Juarez police in this particular case, and as a general policy.

I would grant relief based upon the first ground and therefore would not need to address the second ground.

*jority* op. at 375. For the following reasons, I respectfully dissent.

## I. The Evidence

The evidence presented at the pretrial suppression hearing indicated that on July 31, 1979, five months after the shooting death of Nicolas Castanon, Gerardo Olague contacted the El Paso police and implicated applicant in the crime. Detective Al Medrano of the El Paso police thereupon contacted the Juarez police for assistance since applicant lived with his mother and stepfather in Juarez, Mexico. Medrano and his partner, James Holland, went with Olague to Juarez so that Olague could point out applicant's house to Commandante Jorge Palacios of the Juarez police.

Medrano testified at the hearing that Palacios phoned him early the next morning and informed him that the Juarez police had raided applicant's family's home and had questioned family members. Medrano and Holland went to Juarez to meet with Palacios for breakfast. According to Medrano, Palacios told them at breakfast that applicant's family had revealed that applicant was incarcerated in the El Paso County Jail on an unrelated offense. Medrano and Holland returned to El Paso and retrieved applicant from the county jail for questioning in connection with Castenon's murder. During this interrogation, Medrano advised applicant that the Juarez police had been to his family's home and had questioned family members. Medrano testified, however, that he did not know at that time whether the Juarez police had taken applicant's mother and stepfather into custody, and therefore did not nor could not have related such information to applicant. In response to applicant's questions during the interrogation about whether his family was in custody, Medrano testified that he made a telephone call to Palacios and allowed applicant to speak with him. Medrano stated he did not know what was said during the call. Immediately after the phone call applicant confessed to capital murder.

Applicant's mother and stepfather also testified at the suppression hearing. According to their testimony, Palacios and eight other police officers invaded their home at 3:00

a.m. on the morning of August 1, 1979. The officers seized two letters which applicant and his brother had written to their mother. They were arrested and taken into custody, although they were not charged with an offense. They testified that while in custody at the Juarez jail, applicant's mother was physically abused and threats were repeatedly made to attach an electrical generator, known as a "chacharra," to applicant's stepfather's genitals. They were released at 7:00 p.m. that evening, after applicant had signed a confession.

Applicant testified at the suppression hearing that Medrano coerced him to confess by informing him that his mother was in custody in Juarez and would not be released until he confessed. Applicant also testified that Medrano showed him two letters that he and his brother had written to his mother in an effort to convince him that his mother was in custody.

The Supplemental Offense Report was admitted into evidence at the writ hearing. The Report was signed by Medrano and contains two paragraphs. The first paragraph states that on July 31, 1979, Medrano and Holland took a statement from Olague and went with Olague to meet with Palacios in Juarez and point out applicant's home. The second paragraph states that:

> This date at 5:00 a.m. in the morning, DET. A. MEDRANO was called by phone by Commandante JORGE PALACIOS who stated that they had raided the house [applicant's family's house] pointed out by OLAGUE this morning, August 1, 1979, and *had in custody the mother of the suspect, CESAR FIERRO, her name being SOCORRO REYNA, and her common law husband, ALFREDO MURGA.*

(emphasis added).

## II. Perjured Testimony

Due process is violated when the prosecution knowingly presents materially false testimony to obtain a conviction. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Ex parte Castellano,* 863 S.W.2d 476, 485 (Tex.Crim. App.1993). The State argues that it did not "use" the perjured testimony because it was

elicited on cross-examination by applicant rather than direct examination by the prosecution. The State relies on this Court's opinion in *Luck v. State*, 588 S.W.2d 371 (Tex. Crim.App.1979), in support of its position. In *Luck*, we held that the defendant failed to show the State used perjured testimony in obtaining his conviction because the allegedly perjured testimony was elicited solely during the defendant's cross-examination of the witness. *Id.* at 373. This Court cited no authority in support of its finding and we can find no other Texas case employing such a rule.[2] Nevertheless, *Luck* is distinguishable from this case because the false testimony at issue here was developed during cross-examination of a police officer. We have interpreted the rule regarding use of perjured testimony to prohibit prosecutors from presenting testimony which any member of the "prosecution team," including both investigative and prosecutorial personnel, knows to be false. *Ex parte Adams*, 768 S.W.2d 281, 292 (Tex.Crim.App.1989); *see also United States v. Antone*, 603 F.2d 566 (5th Cir.1979); *Ex*

*parte Castellano*, 863 S.W.2d at 485. Knowledge has been imputed not only from one prosecutor to another, but also from the police to prosecutors. *See Giglio*, 405 U.S. at 150, 92 S.Ct. at 763; *Williams v. Griswald*, 743 F.2d 1533 (11th Cir.1984).

The record supports the trial court's finding that Medrano knew applicant's parents were in custody at the time of applicant's confession.[3] Accordingly, the State's argument must fail in the instant case because the record supports the trial court's findings that Medrano, a member of the prosecution team, not only knew about the false testimony, but presented the false testimony himself.

The record demonstrates that the perjured testimony was material. *See United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (implicit in materiality is concern that outcome of trial was affected). The prosecutor stated that it was his experience that, without Medrano's perjured testimony, the trial court would have

---

**2.** Two Texas cases rejecting claims that a conviction was obtained through false testimony do make mention of the fact that the allegedly perjured testimony was elicited on cross-examination. *See Willis v. State*, 785 S.W.2d 378, 383 (Tex. Crim.App.1989); *Wiltz v. State*, 827 S.W.2d 372, 375 (Tex.App.—Houston [1st Dist.] 1992). Those cases, however, neither cite *Luck v. State* nor stand for the broad rule adopted in that case. Rather, the two cases resolve the issue on other grounds. Furthermore, in *Luck*, this Court never addressed whether the testimony was in fact perjured. *Luck*, 588 S.W.2d at 373. In the instant case we have evidence which supports the trial court's finding that the witness presented false testimony.

It is important to note that other courts have addressed this same argument and found it to be without merit. *See, e.g., United States v. Bontkowski*, 865 F.2d 129, 133 (7th Cir.1989) (stating government must correct false testimony whether testimony is elicited upon direct examination by prosecutor or cross-examination by defense counsel); *United States v. Barham*, 595 F.2d 231, 241 (5th Cir.1979), *cert. denied*, 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 205 (1981) (finding it immaterial whether or not prosecution consciously solicited false evidence); *United States v. Boyd*, 833 F.Supp. 1277, 1345 (N.D.Ill.1993) (citing well established principle that a conviction "must fall under the Fourteenth Amendment ... when the State, although not soliciting false evidence, allows it to go uncorrected when it appears," *quoting Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217

(1959)); *see also Brown v. Wainwright*, 785 F.2d 1457, 1461 (11th Cir.1986).

**3.** In its first finding of fact, the trial court found that, in direct contrast to his testimony at the suppression hearing, when Medrano elicited applicant's confession, he had "information that Defendant's mother and step-father had been taken into custody by the Juarez police with the intent of holding them in order to coerce a confession from the Defendant."

The trial court also found that Medrano presented false testimony regarding the nature and extent of the cooperation between the El Paso police and the Juarez police in this particular case. Medrano testified that he lacked the authority to question residents of Juarez during an investigation and that he "didn't dare" request the Juarez police to question residents, evidence at the writ hearing showed that Medrano regularly sought and received permission from the Juarez police to question witnesses and suspects in Juarez. Palacios' responses in the letter rogatory confirmed that there was "a lot of collaboration" between the El Paso police and the Juarez police during the period of applicant's arrest. Medrano himself noted in an offense report that the El Paso police were "receiving complete cooperation from the Police Inspeccion Section in Juarez." This cooperation included permission from the Juarez police to secure and process evidence, take crime scene photographs, and canvass neighborhoods in Juarez to question potential witnesses.

granted applicant's motion to suppress his confession as a matter of course. The testimony of applicant, his mother, and stepfather, discussed above, support applicant's claim that his confession was coerced and should have been suppressed. The Supplemental Offense Report supports applicant's claim. In addition, lead prosecutor Gary Weiser stated in an affidavit admitted into evidence at the writ hearing that after seeing the Supplemental Offense Report, he now believes Medrano and Palacios colluded to coerce applicant's confession:

> Having learned that Medrano in fact knew about the arrest and having reviewed the testimony presented at the suppression hearing and at trial, I now believe the information about the family's arrest is highly relevant. The record indicates that Detective Medrano put Fierro on the telephone with Juarez Police Commandante Palacios just before Fierro confessed. Based on the supplementary offense report dated July 31, 1979, the testimony presented at the suppression hearing and at trial, and the reputations of Medrano and the Juarez police, I believe that Medrano and Palacios colluded to coerce Fierro's confession.

Weiser also averred that:

> Had I known at the time of Fierro's suppression hearing what I have since learned about the family's arrest, *I would have joined in a motion to suppress the confession. Had the confession been suppressed, I would have moved to dismiss the case unless I could have corroborated Olague's testimony.* My experience as a prosecutor indicates that the judge would have granted the motion as a matter of course. (emphasis added)

Applicant's connection to the crime was based primarily on two pieces of evidence: his confession and the testimony of Gerardo Olague. Applicant's confession alleges that Olague was an accomplice to the crime. Texas Code of Criminal Procedure article 38.14 provides, in relevant part:

> [A] conviction [may] not be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed;

and the corroboration is not sufficient if it merely shows the commission of the offense.

Medrano's perjured testimony ensured admission of applicant's confession at trial. Without the confession, it is probable that Olague's testimony would not have been sufficiently corroborated under article 38.14.

Even assuming that Olague was not an accomplice and that his testimony need not be corroborated, I am not convinced his testimony alone would support applicant's conviction. Olague was not the most credible of witnesses. He did not come forward with information about the crime until five months after the crime was committed. His testimony at trial contained several inconsistencies including his claim that he had known applicant for only a couple of weeks before the murder, and his later testimony that applicant had been telling him to burglarize cars for seven months prior to that event. Olague also testified about certain details of the crime, such as applicant stealing the deceased's watch and wallet, which he did not mention in his statement.

Medrano's perjured testimony was instrumental in obtaining applicant's conviction. Therefore, the record demonstrates not only that the State knowingly presented perjured testimony, but also that the testimony was material. I would hold that the State violated applicant's due process rights when it knowingly presented materially false testimony.

### Harm

Having held the presentation of perjured testimony constituted a violation of applicant's due process rights, I next turn to the question of harm. The majority states that applicant has the burden to prove harm by a preponderance of the evidence that the error contributed to his conviction. *Majority* op. at 375. Assuming *arguendo* the preponderance standard is appropriate in this context, I would conclude applicant met his burden. At the very least, the lead prosecutor's testimony expressing his lack of confidence in this case without the confession demonstrates harm:

Had the confession been suppressed, I would have moved to dismiss the case unless I could have corroborated Olague's testimony.

The only other evidence of applicant's guilt was Olague's testimony addressed, *supra.* Had the prosecutor known of the perjury, by his own admission, there would have been a good chance applicant's case would have been dismissed. This demonstrates that the prosecutor considered the confession critical to his proof. Accordingly, there can be little doubt that the confession contributed to applicant's conviction. In view of the foregoing, I would find the knowing use of perjured testimony contributed to applicant's conviction, even under the standard urged by the majority.

The majority cites *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), to support its claim that the error here is subject to a harmless error analysis. *Majority* op. at 372. However, even in *Brecht* the Supreme Court recognized that some trial errors may be so egregious as to entitle an applicant to relief even if the error could not be shown to affect the jury's verdict. *Id.* 507 U.S. at 637 n.9, 113 S.Ct. at 1722 n. 9, 123 L.Ed.2d at 373 n.9. In this regard, the Supreme Court stated that certain trial error of

a *deliberate and especially egregious* . . . type . . . might *so infect the integrity of the proceeding* as to warrant the grant of habeas relief, even if it did not. . . .

influence the jury's verdict. *Id.* (emphasis added). I believe the knowing use of perjured testimony can be said to so "infect the integrity of the proceeding as to warrant the grant of habeas relief, . . . ."

In conclusion, the State's knowing use of perjured testimony resulted in a violation of applicant's due process rights. Applying the standard used by the majority, I would find by a preponderance of the evidence the error contributed to applicant's conviction. The trial court's findings and conclusions are supported by the record and the law.[4] Accordingly I would grant relief. Because the majority concludes applicant failed to prove the knowing use of perjured testimony was harmful, and therefore denies relief, I respectfully dissent.

4. Contrary to the majority's position, applicant would arguably be entitled to relief upon his claim that the State withheld material evidence, in the form of the Supplemental Offense Report, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At the hearing on applicant's writ allegations, the trial court found that the District Attorney's Office did not withhold the Report from the defense attorneys. *See supra* at 371. The record supports this *factual* finding, however, the pertinent *legal* question is whether the Report was adequately disclosed for purposes of *Brady.*

Commonly, disclosure is made in one of two ways: the material is contained in the State's file released to the defense pursuant to an open file policy, or specific material is flagged as potential *Brady* material mid trial, at which time the defense is given sufficient time to review it. *See, e.g., United States v. Atisha,* 804 F.2d 920 (6th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *Parker v. State,* 594 S.W.2d 419, 424 (Tex.Crim.App.1980), *cert. granted and judgment vacated on other grounds,* 453 U.S. 902, 101 S.Ct. 3134, 69 L.Ed.2d 988 (1981); *Green v. State,* 587 S.W.2d 167, 170 (Tex.Crim.App.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981). In the instant case, none of the attorneys involved, for the prosecution or the defense, recalled ever having seen the Report (prior to January 1994) in the State's files. At the pre-trial suppression hearing, however, the Assistant District Attorney produced the Report in response to a specific question asked of witness Detective Holland, i.e. what time the July 31 meeting took place.

At the writ hearing Holland testified that during his testimony at the suppression hearing he scanned the Report to ascertain the time of the meeting, but did not absorb the information contained in the second paragraph revealing Medrano's perjurious testimony. None of the attorneys who viewed the Report at the suppression hearing had any recollection of the contents of the second paragraph. The circumstances leading to "disclosure" in this case did not provide defense counsel an opportunity for meaningful review of the Report at the suppression hearing. To hold that the Report was adequately disclosed at the suppression hearing would be inconsistent with the principles of fundamental fairness underlying *Brady.*