# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00370-CR

**Ex parte Danish Sheikh**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
## NO. D-1-DC-05-301171, THE HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Danish Sheikh of aggravated assault with a deadly weapon. *See* Tex. Penal Code. Ann. § 22.02 (West 2011). After the return of the guilty verdict, the State and Sheikh reached an agreement as to punishment. Pursuant to that agreement, the trial court sentenced Sheikh to serve ten years in the Texas Department of Criminal Justice, but suspended imposition of the sentence and placed him on community supervision for a period of five years. *See* Tex. Code Crim. Proc. Ann. art. 42.12 (West Supp. 2012).

Approximately one year later, Sheikh filed an application for writ of habeas corpus pursuant to Article 11.072 of the Code of Criminal Procedure asserting four grounds for relief. *See id.* art. 11.072, § 8 (West 2005). Subsequent to a four-day evidentiary hearing, Sheikh filed a supplemental application asserting a fifth ground for relief. The district court granted habeas relief on two of the five grounds upon which Sheikh sought relief and vacated the judgment of conviction.

The State of Texas now appeals the district court's order granting habeas relief and vacating Sheikh's judgment of conviction. *See id.*, art. 44.01(k) (West Supp. 2012); Tex. R. App.

P. 31. Sheikh cross appeals the court's denial of habeas relief on the fourth ground for relief asserted in his original application. *See id.* art. 11.072, § 8. For the reasons that follow, we reverse and render in part, and affirm in part.

## BACKGROUND

### I. Facts of the Case

In September of 2003, Beth Blaney, a student at the University of Texas, began dating Danish Sheikh, a fellow student and one of the residents in her dorm. They dated for approximately one year and nine months before Beth ended their difficult and sometimes violent relationship. Sheikh, however, was not ready to accept the end of their relationship. His behavior towards Beth escalated, culminating in a series of assaults one weekend in May of 2005.

On the evening of Friday, May 13, 2005, Sheikh forced his way into Beth's dorm room, refusing to leave or allow her to leave or call for help. He grabbed her, pushed her, and knocked her down to keep her from the door. He was irrational and screaming at her as he confronted her about their relationship. He kept her up most of the night to discuss their relationship and why she needed to give him another chance, even though Beth repeatedly asked him to leave so she could study for a final exam she had the following day. The next morning, when Beth again tried to make Sheikh leave, he responded with more violence: pushing her, hitting her, kicking her, and eventually choking her as he pushed her against the wall of the bathroom in her dorm room. When later recounting the strangulation incident to the jury, Beth described feeling pain, being unable to breathe normally, becoming dizzy, and losing consciousness. She also told the jury that upon

2

waking up on the bathroom floor, she could not immediately remember what had happened and discovered that she had urinated on herself during the strangulation.

After the assault, Sheikh apologized to Beth and changed her clothes. He then helped her to her futon bed so she could lie down. His helpful attitude did not last, however, as Sheikh responded violently to a comment Beth made by again choking her. This choking episode, fortunately, did not cause Beth to pass out, although her extremities felt tingly. Later that same day, while the two were still in Beth's dorm room, Sheikh once again became upset with Beth and once again choked her, this time pushing her down on the bed and wrapping an empty pillow case around her neck. Sheikh stopped this strangulation before Beth lost consciousness.

Because of Sheikh's assaults against her and refusal to allow her to leave, Beth was unable to study for or take the final exam she had scheduled. Sheikh concocted an elaborate scheme to excuse her absence and cover his abuse. He took her to her classroom and, while Beth waited outside, explained to her professor that Beth had been in a car wreck. Then, to corroborate this lie, he took Beth to the hospital where, in Sheikh's presence, she told the ER doctor, falsely, that she had been in a minor car accident.

After leaving the hospital, Sheikh drove Beth to a local diner where they had dinner. It was now the evening of Saturday, May 14, 2005. Upon leaving the restaurant, Sheikh drove them to the parking garage adjacent to his apartment complex. After he parked the car in his assigned parking space, the two remained in the car while Sheikh attempted yet again to convince Beth to give him and their relationship another chance. When Beth refused, Sheikh once again reacted violently, grabbing her and hitting her repeatedly while they were inside the car. Sheikh then drove the car out

3

of his parking spot and sped towards the top level of the parking garage. When he stopped on the top level, Beth ran from the car. Sheikh pursued her and tackled her, causing her to fall face down on the cement floor. He rolled Beth over, straddled her, and, once again, began strangling her. In describing this strangulation to the jury, Beth indicated that this was the hardest Sheikh had strangled her. She testified that he was squeezing her neck as hard as he could and also pushing down against her neck, causing her a lot of pain. She described being unable to breathe, feeling weak and dizzy, and getting blurry vision. Once again, Sheikh strangled Beth until she lost consciousness. When Beth awoke on the cement floor of the parking garage, Sheikh was still straddling her and she could not feel any part of her body. She was unable to speak or move at all. She could see that Sheikh was slapping her face and hear him demanding that she wake up, but she could not feel his hand striking her.

Sheikh then dragged Beth's body back to the car and put her inside it. He drove back down to his parking spot, removing her just before he parked in his space. He then began forcefully escorting Beth, who was having difficulty walking, to his apartment. As he was pulling her towards his apartment, his roommate arrived. When Sheikh's roommate approached them, Beth ducked behind him attempting to seek help from him. The roommate, unfortunately, did not want to become involved. He did, however, eventually convince Sheikh to go into their apartment and let Beth go back to her dorm. When Sheikh went inside with his roommate, Beth hid behind a car in the parking garage and called a friend for help.

The friend picked Beth up and took her to the apartment of another friend where other friends joined them. Beth's friends observed her injuries—multiple bruises on her neck consistent

4

with being strangled—and urged her to report the incident. Finally, in the early morning hours of Sunday, May 15, 2005, Beth called her mother, who lived in Conroe, Texas, as well as the police. Beth's mother and stepfather traveled to Austin to pick her up. Beth's mom, a nurse, felt that she needed to go to the hospital and took her to Huntsville Memorial Hospital where she worked. At the hospital, Beth was treated in the emergency room by Dr. Michael Edwards who observed and documented her injuries.

The next morning, Monday, May 16, 2005, Beth returned to Austin and met with law enforcement officers of the Austin Police Department's Domestic Violence Unit. She met with two detectives as well as a victim services counselor who all saw her injuries.

## II. Procedural Background

### A. Trial Proceedings

In September 2006, at the conclusion of a five-day trial, a jury convicted Sheikh of aggravated assault with a deadly weapon for the strangulation assault he committed against Beth on May 14, 2005 in the parking garage. The jury also returned an affirmative deadly weapon finding, finding that Sheikh used his hands as a deadly weapon during the course of committing the assault. Subsequent to the return of the guilty verdict, the State and Sheikh reached an agreement as to punishment. Pursuant to the punishment agreement, and with the State's consent, Sheik withdrew his election to have the jury assess punishment. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 2(b) (West Supp. 2012) (upon return of a finding guilty, the defendant may, with the consent of the attorney for the State, change his election of who assesses punishment). Sheikh also waived his right to appeal. The State agreed to recommend a suspended sentence. The negotiated punishment

5

agreement also included various agreed upon community supervision conditions. While not specifically articulated as part of the agreement, the record reflects the understanding that the court would omit the jury's deadly weapon finding. In accordance with the terms of the agreement, the trial court assessed Sheikh's punishment at confinement in the Texas Department of Criminal Justice for ten years but suspended the sentence and placed Sheikh on community supervision for a period of five years.

## B. Habeas Proceedings

In October 2007, just over one year after being placed on community supervision, Sheikh filed an application for writ of habeas corpus pursuant to article 11.072 of the Texas Code of Criminal Procedure, asserting four grounds for relief. The trial court conducted an evidentiary hearing over four days in June and July of 2009. Subsequent to the hearing, in October 2009, Sheikh filed a second supplemental application for writ of habeas corpus asserting a fifth ground for relief.[1] In May 2010, the district court filed an order which included the court's findings of fact and conclusions of law. The order granted habeas corpus relief on the first and fifth grounds asserted in Sheikh's applications, denied relief as to the other three grounds, and vacated Sheikh's judgment of conviction. Both the State and Sheikh filed timely notices of appeal.

---

[1] Apparently, Sheikh filed a first supplemental application in November 2007 that simply expanded on the four grounds raised in the original application. This first supplemental application is not contained in the record on appeal.

6

## C. Grounds for Habeas Corpus Relief

In his original application for writ of habeas corpus, Sheikh asserted four grounds for relief. Sheikh asserted a fifth ground in his supplemental application, filed subsequent to the evidentiary hearing. The grounds relevant to this appeal are the first, fourth, and fifth grounds for habeas relief.

In his first ground for relief, Sheikh alleged that the State knowingly used the perjured testimony of Dr. Michael Edwards, the treating physician in the hospital emergency room where Beth went for medical care after the assault. Sheikh complained about five different statements Dr. Edwards made during the course of his testimony at trial. The habeas court found that three of the complained-of statements were false or misleading. The habeas court further found that only one statement was material. This statement related to the doctor's testimony about having served as chief of the Ben Taub emergency room, when in fact Dr. Edwards served as the chief surgical resident of the emergency center. The habeas court found that this statement was favorable and material and granted relief on this first ground.

In his fourth ground for relief, Sheikh complained that the trial court failed to follow the punishment agreement and therefore, his waiver of the right to appeal—predicated upon the agreement—was invalid. Consequently, Sheikh argued, he was entitled to an out-of-time appeal. Sheik urged that the judgment of conviction reflects the wrong date for the date of offense and incorrectly states that he pled guilty instead of reciting that he pled not guilty but was found guilty by a jury. The habeas court found that the judgment was inaccurate as to these two items and concluded that relief was available through a *nunc pro tunc* judgment. The habeas court further

7

found that: (1) the agreed upon punishment was imposed by the trial court—including the omission of a deadly weapon finding that allowed Sheikh to be eligible for community supervision;[2] (2) the trial court's oral pronouncement of sentence was entirely consistent with the punishment agreement; (3) Sheikh was not harmed by the judgment granting community supervision; and (4) the erroneous judgment did not contribute to Sheikh's conviction or punishment. The habeas court concluded that Sheikh failed to meet his burden of proving facts entitling him to relief and denied habeas corpus relief as to this fourth ground.

In his fifth supplemental ground for relief, Sheik asserted that the State failed to disclose impeachment evidence to the defense: the curriculum vitae, or CV, of Dr. Edwards. At the beginning of his cross examination of Dr. Edwards, defense counsel sought a copy of Dr. Edwards's CV. When asked about the CV, Dr. Edwards indicated that he did not have a copy of his CV with him but explained that he had a copy at his hotel that could be retrieved.[3] The State did not have a copy of the CV but offered to facilitate obtaining a copy for the defense. After some discussion about retrieving the CV, Dr. Edwards's testimony proceeded and concluded without the CV. The next day, the doctor's office faxed a copy of the CV to the District Attorney's office which was then

---

[2] The jury convicted Sheikh of aggravated assault "as alleged in the indictment." The aggravating factor alleged in the indictment was the use of a deadly weapon during the assault. The jury also returned an affirmative answer to a separately submitted question about the use of a deadly weapon. The affirmative deadly weapon finding rendered Sheikh ineligible for judge-ordered community supervision. *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 2012). Arguably, Sheikh was still not eligible for community supervision even with the court omitting the jury's affirmative deadly weapon finding since the offense itself—aggravated assault with a deadly weapon—contained a deadly weapon finding. Nevertheless, the punishment agreement involved the deletion of the deadly weapon finding in order to place Sheikh on community supervision.

[3] The record reflects that Dr. Edwards had moved to California prior to trial and had traveled back to Texas to testify.

delivered to the lead prosecutor but apparently not provided to defense counsel. The habeas court found that the State suppressed the CV, that the CV was favorable evidence, and that CV was material because it contained inconsistencies with the doctor's trial testimony that defense counsel could have used to impeach Dr. Edwards. Accordingly, the habeas court granted relief on this fifth ground.

## D. Points of Error on Appeal

The State appeals the habeas court's grant of relief, raising eight points of error. The first four points of error complain that the habeas court erred in granting relief based upon the State's purported use of perjured testimony of Dr. Edwards concerning his position at the Ben Taub emergency room. The State's first and second points of error assert that the trial court erred because Sheikh failed to establish that the State knowingly used perjured testimony in violation of his federal right to due process or his state right to due course of law. The State's third point of error argues that the habeas court impermissibly granted relief based upon a negligence standard. The State's fourth point of error asserts that the habeas court erroneously concluded that the complained-of testimony was material evidence.

The State's last four points of error contend that the habeas court erred in granting relief based upon Sheikh's claim that the State suppressed Dr. Edwards's curriculum vitae. In its fifth and sixth points of error, the State argues that the trial court erred because Sheikh waived this claim at trial and that the claim was barred by the estoppel doctrine. In its seventh point of error, the State complains that the habeas court erred in concluding that the CV had value as impeachment

9

evidence.  Finally, the State asserts in its eighth point of error that the habeas court erred in concluding that the CV was material evidence.

In a single point of error on cross appeal, Sheikh argues that the habeas court abused its discretion in denying relief on his fourth ground for relief.  He maintains that the trial court failed to follow the punishment agreement and therefore, his waiver of appeal was invalid.  Thus, he contends that the habeas court erred in denying him an out-of-time appeal.

**STANDARD OF REVIEW**

In reviewing a trial court's decision on a habeas corpus application, we review the facts in the light most favorable to the trial court's ruling and, absent an abuse of discretion, uphold the ruling. *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006).  We afford almost total deference to the trial court's factual findings when supported by the record, especially when those findings are based upon credibility and demeanor. *Ex parte Amezquita*, 223 S.W.3d 363, 367 (Tex. Crim. App. 2006).  When the record contains findings of fact, we defer to the findings if the record supports them. *Ex parte Thompson*, 153 S.W.3d 416, 417-18 (Tex. Crim. App. 2005).

In conducting our review, we afford almost total deference to trial court's application of law to the facts if the resolution of the ultimate question turns on an evaluation of credibility and demeanor. *See Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), *overruled on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007).  However, a deferential abuse of discretion review is not appropriate in the context of the application of law to facts when the trial court's decision does not turn on the credibility or demeanor of witnesses. *Ex parte Martin*, 6 S.W.3d 524, 526 (Tex. Crim. App. 1999).  When the trial judge is not in an appreciably better

10

position than the reviewing court, a de novo review by the appellate court is appropriate. *Id.* (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)); *Ex parte Franklin*, 310 S.W.3d 918, 921 (Tex. App.—Beaumont 2010, no pet.). Finally, when the resolution of the ultimate question turns on application of legal standards, we review the determination de novo. *Peterson*, 117 S.W.3d at 819.

## DISCUSSION

## I. False Testimony Claim

The habeas court found that Dr. Edwards made false or misleading statements when he testified that he served as the chief of the Ben Taub emergency room. The habeas court ultimately concluded that these statements were material. In its fourth point of error, the State challenges that conclusion and, consequently, the habeas court's grant of relief on ground one.

### A. Use of False Testimony

A conviction procured through the use of false testimony is a denial of the due process guaranteed by the Federal Constitution. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935); *Ex parte Ghahremani*, 332 S.W.3d 470, 477 (Tex. Crim. App. 2011). A due-process violation may arise not only through false testimony elicited by the State, but also by the State's failure to correct testimony it knows to be false. *Ghahremani*, 332 S.W.3d at 477; *Estrada v. State*, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010) (citing *Napue*, 360 U.S. at 269). "It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence."

11

*Ghahremani*, 332 S.W.3d at 477 (quoting *Duggan v. State*, 778 S.W.2d 465, 468-69 (Tex. Crim. App. 1989)). Thus, due process may be violated by a prosecutor's unknowing use of perjured testimony. *Ex parte Napper*, 322 S.W.3d 202, 242 (Tex. Crim. App. 2010); *Ex parte Chabot*, 300 S.W.3d 768, 771-72 (Tex. Crim. App. 2009).

The case law in this area frequently refers to perjured testimony; however, there is no requirement that the offending testimony be criminally perjurious. *Ex parte Robbins*, 360 S.W.3d 446, 460 (Tex. Crim. App. 2011), *cert. denied*, 132 S.Ct. 2374 (2012); *Ghahremani*, 332 S.W.3d at 477. The rules are not aimed at preventing the crime of perjury but are designed to ensure that the defendant is convicted and sentenced on truthful testimony. *Ghahremani*, 332 S.W.3d at 477-78. Thus, it is sufficient that the witness's testimony is false or gives the trier of fact a false impression. *Robbins*, 360 S.W.3d at 460; *Ghahremani*, 332 S.W.3d at 477; *see Napue*, 360 U.S. at 269; *see also Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (due process violated where witness gave jury "false impression" by testifying that he did not "love" victim and had not been on any "dates" with victim, but omitted fact that he had had sexual intercourse with victim on several recent occasions).

To constitute a due-process violation, the testimony used by the State must have been false and it must have been material to the defendant's conviction, meaning "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Robbins*, 360 S.W.3d at 459-60 (citing *United States v. Agurs*, 427 U.S. 97, 103-04 (1976); *Ghahremani*, 332 S.W.3d at 478). To obtain relief for the unknowing use of false testimony, the habeas applicant must prove by a preponderance of the evidence that the error contributed to his conviction or

12

punishment. *Napper*, 322 S.W.3d at 242; *see Chabot*, 300 S.W.3d at 771 (quoting *Ex parte Fierro*, 934 S.W.2d 370, 374 (Tex. Crim. App. 1996)).

### B. The Testimony of Dr. Edwards

When Dr. Edwards testified at trial, the following exchange took place when the prosecutor asked Dr. Edwards about his prior medical training and experience:

Q. Was this the first time you have worked in an emergency room?

A. No. I worked in emergency rooms for my entire training period, as well as I was the chief of Ben Taub Emergency Room which is the fourth busiest trauma hospital in the United States. And then, I worked for a number of years at Huntsville on a particular basis in the emergency room. And at Baylor there was no emergency room doctor program, so the surgeons cover the emergency room. So we have complete training in emergency management.

Q. Ben Taub is the trauma center in Houston, Texas.

A. It covers the entire metro Houston area.

Q And how long -- what was your position there?

A. I was the chief of the emergency room at Ben Taub covering the entire trauma component of Harris County or Houston.

Q. What does it mean to be chief?

A. I was responsible for the treatment of all patients who were triaged into the emergency room which could be up to 200 a day, 200, 300 patients a day for 24-hour period shifts.

At the writ hearing, Dr. Kenneth Mattox, chief of surgery and chief of staff at the Ben Taub General Hospital, testified that while there is no official title that is "chief of the emergency

room of Ben Taub Hospital," the term chief is often used to refer to the individual who is in control of the emergency center minute by minute. That person is the chief resident. He further testified that one of the requirements of the chief resident assigned to the emergency center is that he sign off on every patient seen in the emergency room, which could be up to 200 patients.[4] Dr. Mattox also testified that the chief resident was the person who would be in control of the flow of patients, the work-up of patients, and the minute-to-minute operation of the emergency room. Consequently, the record reflects that Dr. Edwards conveyed accurate information about his responsibilities in the Ben Taub Emergency Center.

While concluding that the statements about his position were false or misleading, the habeas court found that the term "chief" was commonly used to refer to a chief resident. The court also found that Dr. Edwards was a chief resident and that he worked in the Ben Taub emergency room and was responsible for the treatment of all patients who were triaged into that emergency room. Thus, the findings of habeas court also reflect that the description of duties that Dr. Edwards provided to the jury—"covering the entire trauma component"—was in fact accurate.

## C. Materiality of Testimony

In order to obtain relief based upon Dr. Edwards's testimony which the habeas court found to be false or misleading, the testimony must have been material to Sheikh's conviction. Sheikh must demonstrate a reasonable likelihood that Dr. Edwards's referring to himself as the "chief of Ben Taub emergency room" instead of "emergency center surgery chief" or "chief surgical

---

[4] Dr. Mattox stated that at times the Ben Taub Emergency Center has had as many as 350 to 400 patients a day and, at the time of the writ hearing, had 200 to 300 patients per day.

14

resident" could have affected the judgment of the jury. *See Agurs*, 427 U.S. at 103-04; *Ghahremani*, 332 S.W.3d at 478. We do not find that Sheikh met this burden. Although Dr. Edwards may have referred to himself by the technically inaccurate term used within the medical profession, he accurately informed the jury about his responsibilities and duties. We do not believe the inaccurate or incomplete phrasing of his title contributed to Sheikh's conviction. Thus, we find that this testimony was not material.

Accordingly, we find that the habeas court erred in concluding that Dr. Edwards's statements about his position at the Ben Taub Emergency Center were material and that the State's use of this testimony denied Sheikh due process and due course of law. We further find that the habeas court abused its discretion in granting habeas relief upon this ground. We sustain the State's fourth point of error.[5]

## II. Suppressed Evidence Claim

The habeas court found that the State failed to disclose the curriculum vitae of Dr. Edwards to the defense and, further, that the CV had impeachment value because it failed to contain facts that were inconsistent with the doctor's testimony at trial. The habeas court concluded that the suppressed CV was both favorable and material. In its eighth point of error, the State challenges that conclusion and, therefore, the habeas court's grant of relief on ground five.

---

[5] Because we sustain this point of error, we do not address the other three points of error complaining about the habeas court's grant of relief on ground one. *See* Tex. R. App. P. 47.1.

### A. Brady/Bagley Violation

Due process requires the prosecution to disclose exculpatory and impeachment evidence to the defense that is material to either guilt or punishment. *Ex parte Reed*, 271 S.W.3d 698, 726 (Tex. Crim. App. 2008); *see Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Bagley*, 473 U.S. 667, 676 (1985). To succeed in showing a due-process violation for the suppression of evidence, a defendant must show that: (1) the evidence is favorable to the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the State, either inadvertently or willfully; and (3) the suppression of the evidence resulted in prejudice. *Reed*, 271 S.W.3d at 726; *see Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011) (quoting *Hampton v. State,* 86 S.W.3d 603, 612 (Tex. Crim. App. 2002)).

#### 1. Duty to Disclose

A prosecutor's duty to reveal exculpatory evidence to the defense attaches when the information comes into the State's possession. *Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006). "*Brady* and its progeny do not require prosecuting authorities to disclose exculpatory information to defendants that the State does not have in its possession and that is not known to exist." *Pena*, 353 S.W.3d at 810 (quoting *Hafdahl v. State,* 805 S.W.2d 396, 399 n.3 (Tex. Crim. App. 1990)). Further, the State does not have a duty to disclose if the defendant was actually aware of the exculpatory evidence or could have accessed it from other sources. *Pena*, 353 S.W.3d at 810; *see Harm*, 183 S.W.3d at 407; *Havard*, 800 S.W.2d 195, 204-05 (Tex. Crim. App. 1989).

## 2. Favorable Evidence

To succeed on a *Brady/Bagley* claim, an appellant must show that the evidence withheld by the State was "favorable" to his case. *Pena*, 353 S.W.3d at 811. Favorable evidence is that which, if disclosed and used effectively, "may make the difference between conviction and acquittal." *Id.* (quoting *Bagley*, 473 U.S. at 676). Favorable evidence includes exculpatory evidence as well as impeachment evidence. *Bagley*, 473 U.S. at 676; *Pena*, 353 S.W.3d at 811. "Exculpatory evidence is that which may justify, excuse, or clear the defendant from alleged guilt, whereas impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence." *Pena*, 353 S.W.3d at 811-12; *Harm*, 183 S.W.3d at 408; *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992).

## 3. Materiality

Nondisclosure of favorable evidence violates due process only if it is "material" to guilt or punishment. *Pena*, 353 S.W.3d at 812. Materiality, as incorporated into the third prong, is a requirement that a defendant must be prejudiced by the State's failure to disclose the favorable evidence. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Pena*, 353 S.W.3d at 812 (quoting *Agurs*, 427 U.S. at 109-10); *see Webb v. State*, 232 S.W.3d 109, 114-15 (Tex. Crim. App. 2007) (quoting *Hampton*, 86 S.W.3d at 612). As the Court of Criminal Appeals articulated:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair

17

trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the [State's] evidentiary suppression "undermines confidence in the outcome of the trial."

*Pena*, 353 S.W.3d at 812 n.11 (quoting *Kyles v. Whitley,* 514 U.S. 419, 434 (1995)); *see Bagley*, 473 U.S. at 682 (citing *Strickland*, 466 U.S. at 694). "Hence, the defendant must show that, 'in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure.'" *Pena*, 353 S.W.3d at 812 (quoting *Hampton,* 86 S.W.3d at 612); *see Bagley*, 473 U.S. at 682.

Materiality depends on the circumstances of the particular case and the evidence as a whole. *Webb*, 232 S.W.3d at 114. When evaluating whether the materiality standard is satisfied, the strength of the exculpatory evidence is balanced against the evidence supporting conviction. *Pena*, 353 S.W.3d at 812; *Hampton*, 86 S.W.3d at 613. The suppressed evidence is considered collectively, rather than item-by-item. *Pena*, 353 S.W.3d at 812; *see Kyles*, 514 U.S. at 436.

## B.  The Suppressed Curriculum Vitae

At the beginning of his cross-examination of Dr. Edwards, defense counsel asked the doctor for his curriculum vitae. Dr. Edwards, however, had not brought a copy of his CV with him to the courtroom but had one with his luggage at his hotel. After a brief discussion among the prosecutor, defense counsel, the doctor, and the court about possibly retrieving the CV, defense counsel conducted his cross-examination of the doctor—without the CV. At the conclusion of the doctor's testimony, approximately seven minutes after the discussion about retrieving the CV, there

18

was a question from the court about needing "that" to which defense counsel stated "No."[6]  The next

morning, outside the presence of the jury, the court asked the State if it had, or had ever received,

the CV of Dr. Edwards.  The second chair prosecutor responded that she thought the defense had

decided they did not want the CV and that she did not think the State had obtained a copy of the CV

from Dr. Edwards.  Defense counsel, both present during this exchange, remained silent and never

indicated otherwise.[7]  Later that morning, an employee from Dr. Edwards's office faxed a copy of

---

[6] The following occurred at the end of defense counsel's cross examination of Dr. Edwards:

[DEFENSE COUNSEL]:  I think that's clear enough.  We pass the witness.

[PROSECUTOR]:  We have no further questions for the witness.

THE COURT:  Do we need that?

[DEFENSE COUNSEL]:  No.

[PROSECUTOR]:  Well --

[DEFENSE COUNSEL]:  I think it is clear.

The prosecutor then asked for a brief recess to work with the witness to retrieve his luggage but the
court advised the State to move on to the next witness and the proceedings continued.

[7] Both defense attorneys remained silent during the following exchange:

THE COURT:  Does the State have a C.V. for this witness?  Did you ever get the one
for yesterday's witness, the doctor?

[PROSECUTOR]:  I don't know what the --

THE COURT:  Do you ever get the --

[PROSECUTOR]:  -- if they decided to not want it.

19

the doctor's CV to the District Attorney's office. Shortly after receiving the fax, the victim services coordinator brought it over to the lead prosecutor while the guilt-innocence phase of trial was still in progress. The record contains conflicting testimony about whether the defense was informed about the receipt of the faxed CV.

During their testimony at the writ hearing, both prosecutors indicated that they understood the exchange between the court and defense counsel at the conclusion of Dr. Edwards's testimony to mean that the defense was no longer interested in obtaining the CV. Lead defense counsel testified that he did not know what he and the judge were referring to during that exchange, but co-counsel conceded the exchange could very well have been about the CV. The lead prosecutor also indicated that she believed she had turned the CV over to defense counsel after receiving it from the victim services coordinator although both defense attorneys testified that the State never made them aware that the State had received a faxed copy of the CV.

The habeas court made no specific findings about the exchange that took place at the conclusion of Dr. Edwards's testimony—what the exchange referred to, whether defense counsel had ceased requesting the CV, or whether the prosecutors understood that they no longer had to obtain the CV. However, when finding that the State suppressed the CV, the habeas court did find that the lead prosecutor was not credible and the defense attorneys were credible.[8] The habeas court also found that the State did not disclose the CV to defense counsel during trial.

THE COURT: You didn't even get a copy of it? I was curious.

[PROSECUTOR]: I don't know. I don't think so.

[8] The court made no findings about the credibility of the second chair prosecutor.

The habeas court made a specific finding that the CV was favorable because the inconsistencies between the CV and Dr. Edwards's trial testimony could have been used to impeach Dr. Edwards. These inconsistencies arose not from what the CV contained, but rather from information that was not included in the CV. The habeas court described three inconsistencies: (1) Dr. Edwards testified about moonlighting at Huntsville Memorial Hospital, but did not list this moonlighting experience on his CV; (2) Dr. Edwards did not list Huntsville Memorial Hospital on his CV among the hospitals where he had worked; and (3) Dr. Edwards testified that he was chief of the Ben Taub Emergency Center, but does not list that position or employment on his CV. Characterizing this case as a battle between experts, the habeas court concluded that the CV was material because the defense did not have an opportunity to use the information missing from the CV to impeach Dr. Edwards, the State's expert.

## C. Materiality of Evidence

In order to obtain relief based upon the suppression of Dr. Edwards's CV, Sheikh must demonstrate that the suppression of the CV resulted in prejudice. He must show that, in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the State provided Dr. Edwards's CV to defense counsel. *See Bagley*, 473 U.S. at 682; *Pena*, 353 S.W.3d at 812. However, the mere possibility that the undisclosed CV might have helped the defense impeach Dr. Edwards, or even might have affected the outcome of the trial, does not establish materiality in the constitutional sense. *See Pena*, 353 S.W.3d at 812; *Webb*, 232 S.W.3d at 114-15. The question is whether Sheikh established that the State's failure to disclose the CV

21

undermines confidence in the outcome of the trial.[9] *See Bagley*, 473 U.S. at 682; *Pena*, 353 S.W.3d at 812 n.11.

In reviewing the record, even deferring to the findings of fact made by the habeas court, we do not find that Sheikh met his burden of demonstrating prejudice. When evaluating the materiality of suppressed evidence, we must balance the strength of the impeachment evidence against the evidence supporting conviction. *See Pena*, 353 S.W.3d at 812; *Hampton,* 86 S.W.3d at 613.

### 1. Evidence Supporting Conviction

The indictment in this case charged Sheikh with aggravated assault by causing bodily injury to Beth by choking her and using his hands as a deadly weapon. The evidence supporting Sheikh's conviction—that is, evidence demonstrating bodily injury resulting from strangulation and the use of a deadly weapon—came from multiple sources, not just from Dr. Edwards.[10]

First, the evidence of strangulation and bodily injury came from the testimony of multiple witnesses as well as photographic evidence. Beth testified about the parking garage

---

[9] The State's suppression of the CV could only have begun upon receipt of the faxed CV from Dr. Edwards's office because only then would the impeachment evidence—the inconsistencies from the information missing on the CV—have come into the State's possession or knowledge. *See Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006). We note that the record reflects that the State received the faxed CV the day after Dr. Edwards testified. The record does not indicate whether Dr. Edwards returned to California after his testimony, although it does reflect that at the conclusion of his testimony he intended to retrieve his luggage from his hotel. This suggests that Dr. Edwards was no longer in Texas when the State received the faxed copy of his CV the day after he testified.

[10] Dr. Edwards testified as a fact witness about the injuries he observed on the victim at the time he treated her in the emergency room. These observations were documented in the medical records admitted at trial.

strangulation incident where Sheikh painfully choked her until she lost consciousness. She identified the bruises on her neck in the photographs admitted into evidence as the injuries resulting from Sheik grabbing her around her neck and choking her. In addition, the victim services counselor for the Austin Police Department as well as two of Beth's friends testified that they saw the bruises on Beth's neck after the assault. Further, one of the police detectives testified that he saw the bruises and, based upon his law enforcement experience, the bruises looked like hand prints or fingerprints. Finally, another detective testified about the bruising about Beth's neck area as well as the fact that her voice was raspy.

Second, the evidence supporting the finding that Sheikh used his hands as a deadly weapon also came from multiple sources excluding Dr. Edwards. Again, Beth identified her injuries in the photographs admitted before the jury. She testified that she could not breathe and that she lost consciousness when Sheikh choked her. She also described the brief paralysis that followed the strangulation. Her testimony alone is enough to support the jury's deadly weapon finding. *See English v. State*, 647 S.W.2d 667, 668-69 (Tex. Crim. App. 1983) (either expert or lay testimony may be sufficient to support deadly weapon finding by jury); *see also Tucker v. State*, 274 S.W.3d 688, 691-92 (Tex. Crim. App. 2008) ("Even without expert testimony or a description of the weapon, the injuries suffered by the victim can by themselves be a sufficient basis for inferring that a deadly weapon was used."). In addition, one of the detectives testified that based upon his law enforcement experience with other strangulation cases, he believed that Sheikh's hands were used as a deadly weapon in this case. *See Tucker*, 274 S.W.3d at 691-92 (citing *Hawkins v. State*,

23

605 S.W.2d 586, 588 (Tex. Crim. App. 1980)) (police officers can be expert witnesses with respect to whether deadly weapon was used).

The habeas court concluded that Dr. Edwards's expert medical opinion about strangulation being the cause of the Beth's injuries was crucial to the State's case. But, under the indictment in this case, the State merely had to prove that Sheik caused bodily injury to Beth and that he used a deadly weapon. Neither of these elements required expert medical testimony. It does not take medical expertise to recognize that choking a person to the point that she loses consciousness and suffers bruising on her neck may be sufficient to constitute bodily injury. *See* Tex. Penal Code Ann. § 1.07(a)(8) (West 2011) ("bodily injury" means "physical pain . . . or impairment of physical condition" ); *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009) (The broad definition of bodily injury "encompasses even relatively minor physical contact if it constitutes more than offensive touching. Direct evidence that a victim suffered pain is sufficient to show bodily injury.") (internal citations omitted). In addition, the evidence—without any medical expert testimony—demonstrated that Sheikh's hands in the manner of their use in choking Beth were capable of causing serious bodily injury or death. *See Tucker*, 274 S.W.3d at 691 (citing *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000)) (State not required to prove deadly weapon caused death or serious bodily injury, only that object, in manner of its use or intended use, was *capable* of causing death or serious bodily injury) (emphasis in original). It does not take expert medical testimony to recognize that the inability to breathe could easily place Beth's life in jeopardy.

The overall evidence presented—from Beth, her friends, the detectives, the medical records, and the photographic evidence—strongly supports Sheikh's conviction.

24

## 2. The Impeachment Evidence

The habeas court found that the impeachment value of the CV derived from information the CV failed to contain. These omissions—characterized as inconsistencies by the habeas court—were not, however, the strongest impeachment evidence. The failure to list moonlighting work, the hospital at which that moonlighting work was done, or his position as chief surgery resident of the Ben Taub Emergency Center on his resume simply does not provide strong impeachment material with regard to Dr. Edwards's training and ER experience as a medical doctor. The habeas court concluded that the State suppressed the CV in order to heighten Dr. Edwards's credentials, but the failure to include the noted information does not detract from or conflict with the doctor's credentials as he presented them to the jury in his testimony. When the prosecutor asked about his training, Dr. Edwards testified that he had 15 years of medical training after college. Dr. Mattox testified at the writ hearing that Dr. Edwards's CV reflected anywhere from 14 to 19 years of medical training. Further, Dr. Mattox indicated that to discover the full extent of Dr. Edwards's training you would have to ask Dr. Edwards directly because that information could not be discerned from the CV alone. With regard to his experience working in emergency rooms, Dr. Edwards testified that he worked in emergency rooms for his entire training period. Dr. Mattox testified at the writ hearing that this statement was a true statement based upon Dr. Edwards's CV. Thus, the CV did not contradict Dr. Edwards's trial testimony about his medical training and experience.

Further, the inconsistencies noted by the habeas court do not impugn Dr. Edwards's testimony regarding his training and experience. While it is true that the CV does not list any

25

moonlighting work, this omission creates minimal, if any, impeachment opportunity. In fact, this information provides further evidence of Dr. Edwards's medical experience, possibly enhancing, not diminishing, his expert status. Similarly, the failure of the CV to reflect employment at Huntsville Medical Hospital does not generate strong impeachment material. The CV does not list any employment at all. Rather, the hospitals where Dr. Edwards worked are listed under the "Academic Record" section where he lists the hospitals affiliated with his residency. His moonlighting work at Huntsville Memorial Hospital was not affiliated with his residency. Therefore, this information was appropriately not included in this section of the CV. Dr. Mattox explicitly testified that none of the information on Dr. Edwards's CV concerning his residency experience appeared to be incorrect.

The habeas court emphasized the importance of Dr. Edwards's testimony—and therefore the importance of his CV for impeachment purposes—because of the testimony of two other medical experts. First, the ER doctor who examined Beth the previous day after the dorm room strangulation assaults testified that he did not see any injuries on her. Second, the defense had an expert who concluded, after reviewing the photographs of the victim, that Beth's injuries did not result from strangulation. Because of their testimony, the habeas court concluded that Dr. Edwards was the only witness who found Beth's injuries consistent with her description of being choked. However, the testimony of Beth's friends, the victim services coordinator, and the two detectives—including the one who recognized the bruises as being in the pattern of fingerprints, all corroborate the strangulation assault Beth described. In addition, the photographs of the bruises on

26

Beth's neck further corroborate Beth's account of the assault. Thus, Dr. Edwards's medical opinion was not the crucial evidence the habeas court found it to be.

The habeas court opined that it was critical for the State to demonstrate that Dr. Edwards was proficient and knowledgeable in emergency room medicine.[11] Thus, the court reasoned that the fact that the CV failed to list his position of chief of the Ben Taub Emergency Center provided an opportunity for impeachment to attack Dr. Edwards's credentials. However, as we noted previously, while the title Dr. Edwards used may have been technically inaccurate or incomplete, his description of his duties and responsibilities was entirely accurate. He correctly conveyed his responsibilities and medical experience at the Ben Taub Emergency Center. Thus, because Dr. Edwards accurately described the responsibilities he had, any inconsistency between the title used within the medical community and the technically correct title provided only limited impeachment material.

We conclude that the CV had very little, if any, impeachment value. Accordingly, when balancing the weakness of the impeachment evidence against the strength of the evidence supporting conviction, we conclude that the CV was not material. For that reason we find that the habeas court erred in concluding that the State's suppression of Dr. Edwards's curriculum vitae denied Sheikh due process and due course of law. We hold that the habeas court abused its discretion in granting habeas relief upon this ground and sustain the State's eighth point of error.[12]

---

[11] We note, however, that the record reflects that the State did not emphasize Dr. Edwards's credentials during jury argument at all but only addressed them in response to defense counsel's attack of the doctor's credentials in his closing argument.

[12] Because we sustain this point of error, we do not address the other three points of error related to the habeas court's grant of relief on ground five. *See* Tex. R. App. P. 47.1.

27

# III. Out-of-Time Appeal

In his sole point of error on cross appeal, Sheikh argues that the habeas court abused its discretion in denying relief upon the fourth ground asserted in his habeas corpus application in which he claimed that his waiver of appeal was invalid because the trial court failed to follow the punishment agreement.

## A. *Claim Not Cognizable*

Article 11.072 describes the procedure for an applicant who seeks relief from an order or judgment of conviction ordering community supervision. *See* Tex. Code Crim. Proc. Ann. art. 11.072, § 1. The applicant must be, or have been, on community supervision. *Id*. art. 11.072, § 2(b). In addition, the application must challenge the legal validity of: (1) the conviction for which community supervision was imposed or the order imposing community supervision; or (2) the conditions of community supervision on constitutional grounds. *Id.* art. 11.072, §§ 2(b), 3(c). Thus, the statute authorizes the trial court to grant relief from a judgment of conviction for community supervision or an order imposing community supervision only when the applicant asserts the above-described challenges. *See id.* art. 11.072, § 1.

Sheikh complained in his fourth ground for habeas corpus relief that he was denied his right to appeal. The relief sought reveals the nature of his claim. Sheikh sought an out-of-time appeal. He did not challenge the legal validity of his conviction by the jury—the conviction for which community supervision was imposed—but merely sought a means to subsequently challenge the legal validity of that conviction. Nor did Sheikh challenge the legal validity of the order in which community supervision was imposed. In fact, Sheikh asserts in his brief that his claim before the

28

habeas court "never challenged the lawfulness of his sentence or the manner in which he was granted community supervision." In his fourth ground for relief, Sheikh did not challenge the legal validity of the judgment of conviction at all but rather asserted that the errors in the judgment demonstrated a denial of his right to appeal. Sheikh's complaint about the denial of his right to appeal is not a valid claim under article 11.072.

Because Sheikh's claim failed to challenge the legal validity of his aggravated assault conviction or the order imposing community supervision, we find that Sheikh's claim is not cognizable on an application for habeas corpus relief under article 11.072. Accordingly, we find that the habeas court did not abuse its discretion in denying relief.

## B. The Punishment Agreement

Nevertheless, assuming *arguendo* the claim asserted in Sheikh's fourth ground was cognizable, the habeas court did not abuse its discretion in denying relief because Sheikh was not denied his right to appeal. The record reflects that his waiver of appeal was valid because the trial court followed the negotiated punishment agreement.

At trial, after the jury returned the verdict of guilty, the State and defense reached an agreement as to punishment. Pursuant to the punishment agreement, Sheikh withdrew his election for the jury to assess punishment and waived his right to appeal. The trial court refrained from entering a deadly weapon finding and Sheikh was granted a suspended sentence and placed on community supervision.

Sheikh asserts that errors in the judgment of conviction reflect that the trial court judge failed to follow the punishment agreement. He argues that the failure to follow the agreement

29

rendered his waiver of his right to appeal, predicated upon the punishment agreement, invalid. Thus, he contends, he is entitled to an out-of-time appeal.

The habeas court found that the trial court's judgment of conviction was inaccurate in two ways: (1) the judgment incorrectly reflects that Sheik pled guilty when he actually pled not guilty but was found guilty by the jury, and (2) the judgment erroneously reflects an offense date of May 13, 2005 instead of May 14, 2005.

Sheikh argues that these errors in the judgment reveal that the trial court judge did not punish him for the offense for which the jury found him guilty (the parking garage strangulation assault) but, unbeknownst to him, actually punished him for an extraneous aggravated assault offense (one of the dorm room strangulation assaults).[13] He claims that the judgment of conviction was intentionally entered by the trial court judge—without the parties' knowledge or consent—in an effort to void the effect of the jury's affirmative deadly weapon finding.[14] However, the habeas court

---

[13] The record reflects that while some abusive conduct occurred Friday evening and during their discussions throughout the night, the dorm room strangulation assaults—in the bathroom, on the bed, and on the bed with the pillow case—all occurred on May 14, 2005. Sheikh does not explain how this May 13, 2005 date correlates to an extraneous strangulation offense that occurred in the dorm room other than to simply assert that the May 13, 2005 date refers to the Dobie incident. The record does not support that conclusion.

[14] We note that the extraneous strangulation offenses that occurred in the dorm room would have been aggravated assaults by virtue of Sheikh causing bodily injury to Beth and using his hands as a deadly weapon. So, while entering a judgment of conviction for one of these assaults would have, arguably, voided the jury's deadly weapon finding, the trial court would not have eliminated the deadly weapon problem because the finding would still have been inherent in the offense itself: aggravated assault with a deadly weapon. Thus, it is difficult to discern how the trial court entered a judgment of conviction for an extraneous offense to avoid the deadly weapon issue when doing so did not avoid the issue.

found that the sentence assessed by the trial judge's oral pronouncement was completely consistent with the agreement reached by the parties.

A trial court's pronouncement of sentence is oral, while the judgment, including the sentence assessed, is merely the written manifestation of that oral pronouncement. *Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004); *Keys v. State*, 340 S.W.3d 526, 527 (Tex. App.—Texarkana 2011, no pet.); *see State v. Davis*, 349 S.W.3d 535, 538 (Tex. Crim. App. 2011). When the court's written judgment differs from the court's oral pronouncement of sentence, the oral pronouncement controls. *Ex parte Huskins*, 176 S.W.3d 818, 820 (Tex. Crim. App. 2005); *Ex parte Madding*, 70 S.W.3d 131, 135 (Tex. Crim. App. 2002); *Aguilar v. State*, 279 S.W.3d 350, 354 (Tex. App.—Austin 2007, no pet.). The rationale behind this rule is that all of the parties are physically present at the sentencing hearing and able to hear and respond to the imposition of sentence in the oral pronouncement. *Davis*, 349 S.W.3d at 539; *Madding*, 70 S.W.3d at 135. Therefore, "it is the pronouncement of sentence that is the appealable event, and the written sentence or order simply memorializes it and should comport therewith." *Madding*, 70 S.W.3d at 135 (quoting *Coffey v. State*, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998)); *Keys*, 340 S.W.3d at 527.

In this case, the oral pronouncement of sentence by the trial court at Sheikh's sentencing was consistent with the negotiated punishment agreement. The record of the sentencing clearly reflects that both parties and the judge all understood the ten-year suspended sentence to be the punishment for the offense for which the jury had just found Sheikh guilty. Consequently, the errors in the judgment are simply clerical errors, not judicial errors as Sheikh claims. The proper remedy in a situation where the written judgment differs from the oral pronouncement of sentence

31

is to modify the trial court's judgment to match the oral pronouncement. *Madding*, 70 S.W.3d at 137; *Aguilar*, 279 S.W.3d at 354.

Sheikh contends in his cross-appeal point of error that the habeas court failed to address his claim but instead reframed it. He argues that he complained about the invalid waiver of appeal but the habeas court addressed the illegality of the sentence imposed instead. However, while the court discussed the illegality of the sentence,[15] the court's findings and conclusions directly address Sheikh's complaint about the purported failure to follow the punishment agreement. The habeas court explicitly found that, contrary to Sheik's claim, the trial court did in fact follow the punishment agreement Sheikh negotiated with the State. The court explicitly rejected the premise underlying the claim of an invalid waiver of appeal and, therefore, implicitly rejected this claim. Thus, the habeas court implicitly found that Sheikh's waiver of appeal was valid.

The record supports the habeas court's explicit finding that the trial court followed the punishment agreement and, thus, the court's implicit finding that Sheikh's waiver of appeal in reliance upon that agreement was valid. Accordingly, the habeas court did not abuse its discretion in denying relief upon Sheikh's fourth ground for relief. We overrule the sole point of error in Sheikh's cross-appeal.[16]

---

[15] The habeas court concluded that Sheikh was estopped from complaining about the illegality of the sentence.

[16] In this point of error, Sheikh also complains that the habeas court erroneously issued a *nunc pro tunc* judgment. However, this claim is not properly before this Court as Sheikh never presented this complaint to the habeas court. The *nunc pro tunc* judgment was issued prior to the evidentiary hearing on his application and prior to the filing of his second supplemental application. However, Sheikh raises this complaint for the first time on appeal. *See* Tex. R. App. P. 33.1(a)(1)(A). Furthermore, this complaint is not relevant to his complaint about his purportedly invalid waiver of appeal; thus, we do not address it. *See* Tex. R. App. P. 47.1, 32.1. In addition, a

32

**CONCLUSION**

*On the State's Appeal*

Upon review of the record, we conclude that neither the incomplete title used by Dr. Edwards in his testimony nor the suppressed curriculum vitae were material. Accordingly, the habeas court abused its discretion in granting habeas relief on grounds one and five of Sheikh's application for writ of habeas corpus. We sustain the State's fourth and eighth points of error. The habeas court's order is reversed as to grounds one and five and judgment is rendered denying the application for writ of habeas corpus. The trial court's judgment of conviction is reinstated.

*On Sheikh's Cross Appeal*

Sheikh's complaint about the denial of his right to appeal is not a claim cognizable on an 11.072 writ. Moreover, the record supports the habeas court's findings and conclusion that the trial court followed the punishment agreement at sentencing. Therefore, Sheikh's waiver of appeal was valid and he is not entitled to an out-of-time appeal. For these reasons, the habeas court did not abuse its discretion in denying relief on the fourth ground for relief asserted in Sheikh's application for writ of habeas corpus. We overrule Sheikh's sole point of error on cross appeal. The habeas court's order denying habeas corpus relief on ground four of Sheikh's application for writ of habeas corpus is affirmed.

---

defendant may appeal the trial court's entry of a *nunc pro tunc* judgment. *See, e.g.*, *Moore v. State*, 446 S.W.2d 878 (Tex. Crim. App. 1969); *Johnson v. State*, 233 S.W.3d 420 (Tex. App.—Fort Worth 2007, pet. ref'd); *Fanniel v. State*, 73 S.W.3d 557 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Therefore, Sheikh should have raised any complaints relating to the habeas court's alleged error in entering the *nunc pro tunc* judgment via appeal of that order.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed in part; Reversed and Rendered in part

Filed:   August 17, 2012

Do Not Publish

34